**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION**

ANDREW ALEXANDER, et al.,
on behalf of themselves and all
others similarly situated

                            Plaintiffs,

vs.                                    Civil Action No. 4:20-cv-00021-DMB/JMV

PELICIA E. HALL, et al.,

                            Defendants.

_____/

**PLAINTIFFS' MEMORANDUM IN RESPONSE TO DEFENDANT TURNER'S
MOTION TO DISMISS AND REMAINING DEFENDANTS' MOTION TO
PARTIALLY VACATE PRIOR ORDER (ECF No. 87)**

Defendant Marshall Turner has finally arrived, bringing with him a motion to dismiss and a renewed motion to dismiss in the form of a motion to vacate this Court's prior ruling (ECF No. 87). Defendants either misapprehend, or deliberately mischaracterize Plaintiffs' Complaint by interpreting Plaintiffs' claims of concerted action on the part of the Defendants to deprive Plaintiffs of their constitutional rights. Defendants seem to think that because Plaintiffs have alleged similar actions or inactions by the Defendants that Plaintiffs must not mean what they allege. (ECF No. 128, PageID.2847–48). This is incorrect. Plaintiffs' allegations against Defendants are largely "identical", (ECF No. 128, PageID.2848), because Defendants acted or failed to act in largely "identical" manners, depriving Plaintiffs of their Eighth Amendment rights, something that this Court previously recognized. (ECF No. 87, PageID.2579) ("These conditions, of which *defendants* allegedly were aware and *failed to take any action to correct*, pose a substantial risk of bodily harm to the plaintiffs."). Counsel for Plaintiffs is unaware of any

1

caselaw requiring them to re-word similar claims against different Defendants to make them feel unique or special. For the reasons set forth below, Defendants' Motion (ECF No. 127) should be denied.[1]

I.      Statement of Facts

This putative class action arose from the infamous Mississippi State Penitentiary at Parchman ("Parchman") where Plaintiffs, and members of the putative class, were housed[2] between February 17, 2017, and the present,[3] in conditions that posed a significant risk to their health and safety and deprived them of the basic necessities of human existence on a constant basis. As a preliminary matter, one consistent argument made by Defendants in support of their Motion is that Plaintiffs failed to allege where, when, and for how long Plaintiffs were exposed to any particular condition.[4] True, Plaintiffs do not provide date ranges for the time periods they were subjected to each of these conditions although – contrary to Defendants' claim – Plaintiffs did provide a specific time frame for at least one instance of being denied access to showers. (ECF No. 75, PageID.2467, ¶65) ("Inmates at Unit 29 were not permitted to shower for weeks beginning on Christmas day, December 25, 2019."). Plaintiffs' other factual allegations do not have specific dates for the simple reason that they were pervasive at Parchman during the entire

---

[1] Regarding Defendants' arguments on the issue of compensatory damages under 42 U.S.C. § 1997e and Plaintiffs' 42 U.S.C. § 1985 claim, Plaintiffs incorporate their arguments from (ECF No. 80).

[2] (ECF No. 75, PageID.2464, ¶55).

[3] (ECF No. 75, PageID.2463, ¶52).

[4] *See* (ECF No. 128, PageID, 2860–63) (regarding vermin and insects, mold/leaky roof, sewage, plumbing, dirty cells, the inability to shower, and lighting and electricity).

period covered by Plaintiffs' lawsuit beginning February 17, 2017. The conditions were also ubiquitous throughout Parchman[5] and experienced by all Plaintiffs and putative class members.

a. Risk of Violence

Contrary to Defendants claim that "Plaintiffs vaguely allege that MSP is violent and subject to gang activity," (ECF No. 128, PageID.2859), Plaintiffs have very specifically pled that there was a consistent, and very serious, threat of violence to all persons incarcerated at Parchman. Throughout 2019 numerous riots occurred at Parchman culminating in the terrible 2019–2020 riot that left nine inmates dead and so many injured that the 128-bed medical unit at Parchman could not treat them all. (ECF No. 75, PageID.2453). These riots were just flare-ups of the constant violence – primarily gang related – that was a fact of life at Parchman. Defendant Hall herself described the situation as a "pressure cooker type situation . . ." in January of 2019. (ECF No. 75, PageID.2466, ¶61).[6] Corrections officers consistently fail to respond to serious issues such as violence within the units at Parchman leading to a situation where Plaintiffs and members of the putative class have been forced to set fires to obtain assistance. (ECF No. 75, PageID.2469, ¶¶80–81). Furthermore, the violence that consistently occurred at Parchman was

---

[5] Additionally, while certainly outside the scope of the pleadings for purposes of Defendant Turner's Motion to Dismiss, and addressed more fully *infra*, Plaintiffs have sought to narrow their class definition to persons who were confined at Unit 29 starting January 17, 2017, including those persons subsequently transferred to Unit 32 after the December 2019–January 2020 riots.

[6] Directly refuting Defendants claim that "[t]here is nothing in the Complaint to indicate that Turner (or any other Defendant) was aware that specific inmates posed an excessive risk of harm to the Plaintiffs' safety." (ECF No. 128, PageID.2859). Additionally, the idea that Plaintiffs must demonstrate that Defendants were aware that specific prisoners posed a risk to other prisoners has been explicitly foreclosed by the Supreme Court. *Farmer v. Brennan*, 511 U.S. 825, 843 (1994).

3

not a mere "inevitab[ility]", (ECF No. 128, PageID.2859) (citation omitted). No, every Defendant played a role in the pervasive atmosphere of violence that existed at Parchman by turning a blind eye to the dangers all persons incarcerated there faced,[7] hiring and retaining staff members with known links to gangs,[8] smuggling in the contraband that fueled gang violence,[9] knowingly placing prisoners in positions that exposed them to an acute risk of gang violence due to the prisoner's former or current gang affiliation,[10] and/or actively giving gang members the keys to other prisoners' cells.[11] Furthermore, numerous Defendants have actively prevented Plaintiffs from seeking administrative remedies and/or medical treatment, increasing the risk of severe injury and permitting gang violence to continue, unabated. (*See* ECF No. 75, PageID.2479, 2481–85, ¶¶97, 100, 102–104). Armed with the knowledge of the incredible risk of violence each and every member was constantly exposed to, not a single Defendant took any action to mitigate that risk.

b. Unconstitutional Environmental Conditions

Quite simply, the environmental conditions at Parchman were inhumane and exposed Plaintiffs and members of the putative class to an unreasonable risk of harm. The MDOC itself has described Unit 29 of Parchman as "unsafe for staff and inmates because of age and general deterioration." (ECF No. 75, PageID.2467, ¶63). A June 2019 inspection of Parchman found

---

[7] All Defendants.

[8] Defendants Turner, Cox, Morris, Banks, Sturdivant, Flagg, Morris, and Simon. (ECF No. 75, PageID.2472–75, ¶87, 89–91, 92–96).

[9] Defendant Williams. (ECF No. 75, PageID.2475–76, ¶92).

[10] Defendants Simon, King, Meeks, Lee, Lathan, Westmoreland, Webb, Haywood (ECF No. 75, PageID.2476, 2479–86, ¶¶93, 97–98, 100–104). (*See also* ECF No. 75, PageID.2490, ¶119) (same).

[11] Defendants Westmoreland, Webb, Haywood. (ECF No. 75, PageID.2483–85, ¶¶102–104).

4

"more than 400 cells with problems such as flooding and leaks, lack of lights, power and water, broken toilets and sinks, broken windows and bird nests, as well as missing pillows and mattresses." *Id.* Inmates are forced to use their sink or a plastic bag for a bathroom when their toilets do not work, (ECF No. 75, PageID.2468, ¶70), and the "[t]oilets overflow with sewage which spills out and remains on the floors." (*Id.* at ¶72). Vermin crawl over inmates and eat their food. (ECF No. 75, PageID.2468, ¶71). Beyond these pervasive environmental conditions, there were certain periods that got significantly worse such as when Plaintiffs and members of the putative class were denied showers for weeks at the end of 2019. (ECF No. 75, PageID.2467, ¶65).

## II. Legal Standards

### A. Standing

To establish Article III standing, a plaintiff must demonstrate that they: 1) suffered an injury that is concrete and particularized; 2) which is fairly traceable to the defendant's conduct; and 3) a favorable ruling is likely to redress that injury. *Dep't of Commerce v. New York*, 139 S.Ct. 2551, 2565 (2019) (citation omitted). The pleading standard for establishing Article III standing mirrors the procedural posture of the case, thus, at the present motion to dismiss stage Plaintiffs "must allege facts that give rise to a plausible claim of [their] standing." *Barilla v. City of Houston*, 13 F.4th 427, 431 (5th Cir. 2021) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). Furthermore, courts must "take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff." *Id.* (citation and internal quotation omitted). While Plaintiffs bear the burden of proving standing, *McMahon v.*

5

*Fenves*, 946 F.3d 266, 271 (5th Cir. 2020) (citation omitted), they will survive a motion to dismiss for lack of jurisdiction if they "alleg[e] a plausible set of facts establishing jurisdiction." *Id.* (citation omitted).

B. Motion to Dismiss

When considering a motion to dismiss pursuant to Rule 12(b)(6), a claim should only be dismissed when a plaintiff has not alleged enough facts to state a claim for relief that is plausible on its face. *See Shakeri v. ADT Sec. Servs., Inc.*, 816 F.3d 283, 290 (5th Cir. 2016); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Under Rule 12(b)(6), a court must accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiff. *See Shakeri*, 816 F.3d at 290.

III.    Argument

A. Plaintiffs Have Standing

Defendants have decided to rehash – for the third time – their arguments that Plaintiffs lack standing to bring this lawsuit. (*See* ECF No. 87, PageID.2575) ("The defendants, presenting arguments nearly identical to those in their first motion to dismiss, argue the plaintiffs lack standing because they (1) 'have not made any specific allegations to place themselves among those inmates allegedly injured at Parchman'; and (2) '[e]ven assuming Plaintiffs alleged an injury, they still cannot satisfy the causation requirement for standing' because they 'have not alleged any particular conduct by any particular Defendant' that is traceable to the injury . . ."). This Court should not disturb its prior decision. (ECF No. 87). Quite simply, Defendants' arguments are without merit because Plaintiffs have properly pled that Defendants violated their

Eighth Amendment rights and Plaintiffs seek nominal and punitive damages to the extent that they are not able to recover compensatory damages.

      i.      Plaintiffs Have Properly Alleged an Injury

The "injury" necessary to confer Article III standing in constitutional claims, "often turns on the nature of the source of the claim asserted." *Barber v. Bryant*, 860 F.3d 345, 356 (5th Cir. 2017) (citation omitted). Here, Plaintiffs have alleged a violation of their Eighth Amendment rights. Defendants correctly admit that a plaintiff properly pleads an Eighth Amendment claim under 42 U.S.C. § 1983 by demonstrating that prison conditions "pose an unreasonable risk of serious damage to a prisoner's health . . . and prison officials must have acted with deliberate indifference to the risk posed . . ." (ECF No. 128, PageID.2853) (quoting *Dockery v. Cain*, 7 F.4th 375, 378 (5th Cir. 2021) (internal quotation omitted).[12]

Defendants incorrectly argue that Plaintiffs have not claimed injury by conflating allegations sufficient to warrant compensatory damages with those sufficient to warrant solely nominal and punitive damages. (ECF No. 128, PageID.8–9). Defendants claim, "Plaintiffs have not made any specific allegations to place themselves among the inmates allegedly injured at MSP." (ECF No. 128, PageID.2849). Preliminarily, Defendants *appear* to be implying that Plaintiffs do not meet the individual and particularized injury-in-fact requirement. (*See* ECF No. 128, PageID.2850).

---

[12] Additionally, pursuant to 42 U.S.C. § 1983 a plaintiff must establish "that the alleged deprivation was committed by a person acting under the color of state law." (ECF No. 128, PageID.2852) (quoting *Doe ex rel. Magee v. Covington Cty. Sch. Dist.*, 675 F.3d 849, 854 (5th Cir. 2012) (internal citation omitted). Plaintiffs do not understand Defendants to argue that they were not acting under the color of state law. However, for the sake of thoroughness, Plaintiffs clearly allege that Defendants all are, or were, employees of the State of Mississippi and their conduct was done under the color of law. (ECF No. 75, PageID.2470–86, ¶¶85–105)

To the extent Defendants make this claim, it is meritless. The Supreme Court has clearly defined what individual and particularized injuries are, "it must affect the plaintiff in a personal and individual way." *Spokeo v. Robins*, 578 U.S. 330, 339 (2016) (citation omitted). Plaintiffs have alleged that they were incarcerated at Parchman in conditions below the threshold set by the Eighth Amendment. Plaintiffs need not allege specific physical injuries to be entitled to nominal and punitive damages because their personal constitutional rights were violated. *Hutchins v. McDaniels*, 512 F.3d 193, 198 (5th Cir. 2007).

However, Plaintiffs have clearly alleged that Defendants were deliberately indifferent to environmental conditions that violate the Eighth Amendment and for actively creating a more dangerous prison environment in violation of the Eighth Amendment,[13] and that they were all incarcerated at Parchman under the conditions violating the Eighth Amendment. (ECF No. 75, PageID.2457–58, ¶19). Taking Plaintiffs' allegations as true, they have pled sufficient facts to demonstrate that they were denied their Eighth Amendment rights, a constitutionally cognizable injury. *See Hutchins v. McDaniels*, 512 F.3d 193, 198 (5th Cir. 2007) (holding that 42 U.S.C. § 1997e did not bar a prisoner's claim for nominal and punitive damages for violations of his Fourth Amendment rights despite an absence of physical injury) *accord Humphrey v. Hall*, No. 1:19cv362-HSO-RHWR, 2022 U.S. Dist. LEXIS 55087 (N.D. Miss. Mar. 28, 2022) ("The PLRA does not preclude a prisoner from recovering other types of damages for a constitutional violation, such as nominal or punitive damages, even when the prisoner is unable to show any physical injury.") (citing *Hutchins*, *supra*). Thus, as this Court previously recognized, whether

---

[13] *See supra*, § I.

Plaintiffs have suffered an injury-in-fact "go[es] to the heart of a § 1983 claim against an individual defendant, creating an overlap between the standing challenge and the merits of the plaintiffs' claims." (ECF No. 87, PageID.2575) (internal quotation and citation omitted) (alteration added).

As this Court previously recognized, Plaintiffs clearly alleged that "as inmates at Parchman, they were exposed to vermin, black mold, filthy cells, unsafe food, leaking roofs, and exposed wiring, as well as experienced an inability to shower, lack of electricity, and sewage backup. These conditions, of which defendants allegedly were aware and failed to take any action to correct, pose a substantial risk of bodily harm to plaintiffs." (ECF No. 87, PageID.2579–80). This Court also found that Plaintiffs clearly alleged the conduct each Defendant was engaged in that led to the violation of Plaintiffs' constitutional rights:

> Each of these individuals is aware of the conditions at Parchman. Hall and Taylor, during their respective service as Commissioner, had the power to "[e]stablish the general policy of the Department; implement and administer laws and policy related to corrections; and establish standards and exercise the requisite supervision as it relates to correctional programs over all state-supported adult correctional facilities. Mallet and Taylor are responsible for the "daily functioning and administration of all MDOC institutions, including Parchman."

> In their respective positions at the prison, Turner, Cox, T. Morris, Banks, Simon, Sturdivant, V. Flagg and J. Morris have "hired and continued to employ persons who are affiliated with gangs." King, Meeks, S. Flagg., Lee, Lathan, Westmoreland, Webb, and Haywood have "prevented or obstructed inmates from filing and receiving administrative and legal assistance by denying them access" to the necessary forms. Additionally, S. Flagg has attacked inmates and filed reports of unverified complaints against inmates; and Westmoreland, Webb, and Haywood gave gang members keys to other inmates' cells. Williams "caused, causes and facilitates contraband to infiltrate Parchman."

(ECF No. 87, PageID.2577–78) (citations to the record omitted).

9

It is undisputed that the Named Plaintiffs were all incarcerated at Parchman between February 17, 2017, and March 16, 2021, (ECF No. 75, PageID.2457, ¶19), or that there were significant concerns about the risk of violence at Parchman prior to the deadly riots in December 2019–January 2020. (*Id.* at PageID.2463, 2466, ¶¶52, 61).[14] Nor is it disputed that both the MDOC and the Mississippi Department of Health ("MDH") recognized significant environmental risks at Parchman. (*Id.* at PageID.2467, ¶¶62–63).[15] Ultimately, "[e]ach of the Parchman Class Representative Plaintiffs, like all putative Parchman Class members, is subject to Defendants' actions and non-actions in failing to provide a sufficient staffing and a safe, constitutional environment at Parchman." (*Id.* at PageID.2464, ¶55). Plaintiffs' allegations regarding the "general" conditions at Parchman, refer to conditions *that all Named Plaintiffs and members of the putative class personally experienced*. Defendants' claim that Plaintiffs did not allege any personal injuries, or that Plaintiffs' injuries are not sufficient to establish standing are meritless.

ii.    Plaintiffs' Injuries are Fairly Traceable to Defendants' Conduct

Plaintiffs' injuries, in the form of violations of their Eighth Amendment rights, are also fairly traceable to Defendants' conduct. First, Plaintiffs properly alleged that Defendants knew of the conditions at Parchman from: 1) personally inspecting Parchman; 2) receiving complaints from members of the putative class regarding the conditions at Parchman; 3) from MDOC and the MDH statements and reports concerning the risks of violence and unsafe environmental factors;

---

[14] And the date of filing Plaintiffs' Operative Complaint.

[15] Additionally, Plaintiffs' allegations regarding the specific conditions they – and all members of the putative class – were exposed to are undisputed for purposes of Defendants' Motion to Dismiss. (*See id.* at PageID.2467–70, ¶¶65–83).

and/or 4) from being personally involved in the criminal activities of gangs operating at Parchman. Second, Plaintiffs properly alleged that Defendants had the authority to address the issues at Parchman. Third, Plaintiffs properly alleged that Defendants did nothing to make the conditions better and, in many cases, were actively using their authority and positions to make the conditions at Parchman worse. Failing to take any steps to address the environmental conditions at Parchman violated Plaintiffs' Eighth Amendment rights. Failing to provide adequate protection from violence violated Plaintiffs' rights. And actively supporting gang activities at Parchman by hiring and retaining staff known to be affiliated with gangs, smuggling contraband into Parchman for gangs, and providing prisoners with access to other prisoners' cells substantially increased the risk of harm Plaintiffs and all members of the putative class faced at Parchman. (ECF No. 75, PageID.2469, 2470–86, ¶¶77–78, 85–105).

Persons sued under 42 U.S.C. § 1983 can only be held liable for their unconstitutional conduct. This can be direct participation in unconstitutional activities or being deliberately indifferent to unconstitutional conditions, i.e., knowing about the condition and failing to take steps to remedy it. Here, Plaintiffs' injuries are fairly traceable to the failures of individual corrections officers personally failing to address persistent environmental conditions, failing to provide any semblance of security against the risk of violence, and/or directly promoting violent gang activity at Parchman. Plaintiffs' injuries are also fairly traceable to the supervisory Defendants', those with control over the staffing and policies at Parchman, by knowingly failing to ensure appropriate staffing levels, failing to screen staff for gang affiliations, continuing to retain staff with known gang affiliations, failing to promulgate policies designed to prevent gang

11

members from working at Parchman, failing to implement policies to ensure that the environmental conditions at Parchman were addressed, and failing to adequately train and supervise individual staff members at Parchman. Defendants offhand attempt to characterize the risks of violence from other inmates as "the independent act of some third party not before the court," (ECF No. 128, PageID.2850) (quoting *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 41 (1976)), ignores that it is "well established that prison officials have a constitutional duty to protect prisoners from violence at the hands of their fellow inmates." *Longoria v. Texas*, 473 F.3d 586, 592 (5th Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994)).

Defendants also claim, in passing, that Plaintiffs' allegations are merely conclusory and therefore not entitled to the presumption of truth accorded to well-pled factual allegations. (ECF No. 128, PageID.2850–51) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009). Plaintiffs' allegations easily cross the threshold from conclusory to plausible. Specifically, while Plaintiffs do generally allege that each Defendant had knowledge of the conditions at Parchman, these allegations are supported by further factual allegations. The first is that there were statements from the MDOC, in particular Defendant Hall, and the MDH concerning both the risk of violence and the environmental conditions. (ECF No. 75, PageID.2466–67, ¶¶61–63). There were also *four* violent riots at Parchman in 2019 alone. (ECF No. 75, PageID.2467. ¶64). Areas where prisoners were confined at Parchman were "legally condemned as unsafe for human habitation . . ." (ECF No. 75, PageID.2468, ¶69). Furthermore, Plaintiffs directly alleged that each Defendant personally inspected Parchman and received numerous complaints from persons

12

incarcerated there about the conditions.[16] (ECF No. 75, PageID.2470–87). There are two, related inferences, from these factual allegations. First, the conditions at Parchman were so long-standing and widespread that Defendants could only be ignorant to them if they actively tried to do so.[17] Second, each Defendant had *personal* knowledge of the conditions at Parchman through their inspections and/or work at the facility. The reports from MDH and statements made by the MDOC and Defendant Hall also support Plaintiffs' specific factual allegations regarding food, waste, and violence. (ECF No. 75, PageID.2468–70, ¶¶68–83).

In sum, Defendants in their respective positions, had direct or indirect control over the conditions Plaintiffs were forced to endure. Every single Defendant was aware of the conditions at Parchman, environmental and with respect to the high prevalence and risk of violence. Each Defendant could – and should have – taken actions to mitigate the risk of harm from violence and environmental conditions *and* ensured that Plaintiffs had access to the basic necessities of life. Unfortunately for Plaintiffs, Defendants did nothing to mitigate these issues. In fact, some Defendants were directly involved in making the risk of violence worse. Thus, because Defendants had knowledge of the unconstitutional conditions and either refused to use their authority to address those conditions or used their authority to make those conditions worse, Plaintiffs' injuries are fairly traceable to Defendants' conduct. Defendants cannot hide behind

---

[16] It is also a reasonable inference that attempts by some Defendants to prevent Plaintiffs from accessing the administrative remedy program or obtain any type of remedy are indicative of knowledge of the underlying issues. (*See* ECF No. 75, PageID.2479, 2481–85, ¶¶97, 100, 102–104). Why would prison officials actively work to deny Plaintiffs administrative remedies if there were not some underlying culpability?

[17] It is questionable whether even the most dedicated effort to not learn about the conditions would be successful.

their collective failures and claim that because they all failed to address the unconstitutional conditions, none of them can be held responsible. Thus, Plaintiffs' injuries are fairly traceable to Defendants' conduct.

iii.    A Favorable Ruling from this Court Will Redress Plaintiff's Injuries

As Fifth Circuit precedent unambiguously establishes, "[w]hile Hutchins is certainly barred from recovering any compensatory damages in the absence of physical injury, we hold today that Hutchins may recover nominal or punitive damages, despite § 1997e(e), if he can successfully prove that McDaniels violated his Fourth Amendment rights." *Hutchins v. McDaniels*, 512 F.3d 193, 198 (5th Cir. 2007). Plaintiffs seek the same here. Specifically, Plaintiffs seek nominal and punitive damages. Plaintiffs do not understand Defendants to dispute that a favorable ruling would redress Plaintiffs' injuries[18] for purposes of the standing inquiry.

B.  Defendants are Not Entitled to Qualified Immunity

Defendants admit, "[q]ualified immunity provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'" (ECF No. 128, PageID.2855) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)) (emphasis and alteration added). An official is only entitled to qualified immunity if: 1) they did not violate a plaintiff's constitutional rights; or 2) the plaintiff's constitutional rights were not clearly established at the time the official violated their rights. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). However, a court may address either question first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Before addressing the substance of Defendants' motion, it is necessary to address their grievance that "[t]he allegations leveled

---

[18] Beyond disputing that Plaintiffs have suffered a cognizable injury.

14

against Turner are exactly the same as those leveled against most Defendants." (ECF No. 128, PageID.2857).[19] There is no case, court rule, or any other prohibition on a plaintiff using the same language to describe the same conduct by numerous defendants. This is what Plaintiffs have done. Notably, Defendants must qualify their grievance with the word "most"; this is not an error. Plaintiffs pled their claims against each Defendant based on the conduct of those individual Defendants and Plaintiffs' allegations against each Defendant are only identical when the behavior of those Defendants was identical.[20]

As an initial matter, the Defendants who were directly, and actively, involved in promoting gang violence at Parchman[21] cannot claim qualified immunity under any theory. There can be no disagreement on this point; A prison official cannot claim to be shielded by qualified immunity for conduct that is clearly criminal in nature. *See Malley*, 745 U.S. at 341 (providing that qualified immunity is not available to "those who knowingly violate the law.").

For purposes of this case, the relevant inquiry is whether Defendants were deliberately indifferent to the risks of harm Plaintiffs were exposed to. *Farmer*, 511 U.S. at 828. Thus, Plaintiffs must demonstrate that they were exposed to a substantial risk of serious harm and that Defendants were aware of the risk and failed to take reasonable steps to mitigate it. *Id.* at 837.

i.     Plaintiffs Have Properly Pled a Failure to Protect Claim

"It is well established that prison officials have a constitutional duty to protect prisoners from violence at the hands of their fellow inmates." *Longoria v. Texas*, 473 F.3d 586, 592 (5th Cir.

---

[19] This grievance is a consistent theme throughout Defendants' motion.
[20] As evidenced by the distinct claims against various defendants.
[21] Those Defendants who provided cell keys to prisoners or Defendant Williams who was involved in smuggling contraband into Parchman for gangs.

2006) (citing *Farmer*, 511 U.S. at 818). Plaintiffs have already addressed the knowledge that each Defendant had about the conditions at Parchman from personal inspections, public statements and reports, and complaints sent by members of the putative class.[22] Plaintiffs have also established that Defendants failed to take any steps to reduce the risk of violence at Parchman or, in the worst cases, exacerbated that risk by providing keys to prisoners[23] or smuggling contraband for gangs.[24] Some Defendants who were not directly involved in smuggling for gangs or providing them with cell keys perpetuated those problems by *knowingly* hiring and retaining staff with known gang affiliations.[25] And no Defendants, from the corrections officers to the supervisors did anything to *mitigate* the well-known risk of violence.

Beyond Plaintiffs' allegations concerning the risks that they experienced, the undisputed fact is that the "pressure" cooker situation at Parchman culminated in the December 2019–January 2020 riots that left nine dead. (ECF No. 75, PageID.2468, ¶¶66–67). These were not even the only riots at Parchman in 2019. (ECF No. 75, PageID.2467, ¶64). These undisputed facts support Plaintiffs' specific allegations that the problem of guards not entering Parchman to provide assistance or prevent violence got so bad that prisoners were forced to resort to setting fires to obtain assistance in cases of emergency. (ECF No. 75, PageID.2469, ¶¶80–83).

Defendants seem to imply that Plaintiffs need to allege what Defendant Turner, and the other Defendants, failed to do. (ECF No. 128, PageID.2857) ("Absent is any specificity regarding who

---

[22] *See supra*, § II(A)(ii).
[23] Defendants Westmoreland, Webb, Haywood. (ECF No. 75, PageID.2483–85, ¶¶102–104).
[24] Defendant Williams. (ECF No. 75, PageID.2475–76, ¶92).
[25] Defendants Turner, Cox, Morris, Banks, Sturdivant, Flagg, Morris, and Simon. (ECF No. 75, PageID.2472–75, ¶87, 89–91, 92–96).

complained to Turner, what if anything they complained about, when they complained about it, and what Turner did *or failed to do*.") (emphasis added).[26] Defendants are effectively asking Plaintiffs to prove a negative. Plaintiffs allege that Defendant Turner knew of the conditions, including the risk of violence, and the *only* thing he did was knowingly hire and/or retain staff with gang affiliations. (ECF No. 75, PageID.2472, ¶87). Defendant Turner did not discipline anyone, did not implement any policies designed to prevent persons with gang affiliations from working at Parchman, did nothing to improve the conditions and absolutely did nothing to stem the flow of contraband into the facility. These failures all fall under the umbrella of "failed to take reasonable measures to abate the substantial risks of serious harms" with respect to gang violence. There may be a laundry list of reasonable actions Defendant Turner *could* have taken to mitigate the risk of violence Plaintiffs and members of the putative class experienced; Defendant Turner's problem[27] is that he did *nothing*.

Defendants also claim that Plaintiffs' allegations that Defendant Turner, and others, "knowingly and willfully hired and continued to employ persons who are affiliated with gangs" is nothing more than a legal conclusion. (ECF No. 128, PageID.2857). This is incorrect. Plaintiffs certainly do allege that Defendant Turner and others knowingly hired and retained persons affiliated with gangs. (ECF No. 75, PageID.2472–75, ¶87, 89–91, 92–96). However, Plaintiffs also alleged that many guards are gang affiliated and either provide gang members with keys or smuggle contraband for gangs. (ECF No. 75, PageID.2469, ¶¶77–78). Plaintiffs then

---

[26] Plaintiffs previously addressed the question of Defendant Turner's knowledge regarding the conditions at Parchman. *See supra*, § II(A)(ii).

[27] And the problem for each Defendant.

17

identify several Defendants who have either: 1) provided gang members with cell keys;[28] 2) knowingly placed prisoners at a heightened risk of gang violence in positions of vulnerability with respect to gangs;[29] and 3) smuggled contraband into the facility for gang members.[30]

Thus, because the Eighth Amendment obligation to protect prisoners from the risk of violence is clearly established, *each* Defendant was aware of the significant risk of harm of violence at the hands of other prisoners that Plaintiffs faced, and *each* Defendant failed to take reasonable steps to mitigate that risk of harm[31] they are not entitled to qualified immunity.

ii. Plaintiffs Have Properly Pled an Eighth Amendment Violation Predicated on Environmental Conditions at Parchman

It is clearly established that a plaintiff has properly pled a violation of the Eighth Amendment where he or she is exposed "to a substantial risk of harm" and denied the "minimal civilized measure of life's necessities" and that prison officials were deliberately indifferent to that risk of harm. *Arenas v. Calhoun*, 922 F.3d 616, 621 (5th Cir. 2019) (quoting *Farmer v. Brennan*, 511 U.S. at 834). And, as this court previously recognized, that courts in the Fifth Circuit have previously found that filthy cells and "conditions including inadequate lighting, non-functional plumbing, the presence of vermin, inadequate ventilation, the presence of fire or safety hazards, inadequate cleaning supplies, and forced segregation and isolation have violated prisoners' Eighth Amendment rights." (ECF No. 87, PageID.2580) (citations omitted). Defendants' claim that the allegation that "'[t]he conditions present at Parchman, *taken as a whole*, constitute a

---

[28] Defendants Westmoreland, Webb, Haywood. (ECF No. 75, PageID.2483–85, ¶¶102–104).

[29] Defendants Simon, King, Meeks, Lee, Lathan, Westmoreland, Webb, Haywood (ECF No. 75, PageID.2476, 2479–86, ¶¶93, 97–98, 100–104). (*See also* ECF No. 75, PageID.2490, ¶119) (same).

[30] Defendant Williams. (ECF No. 75, PageID.2475–76, ¶92).

[31] Or took affirmative actions to increase the risk of harm.

grave and imminent danger to Plaintiffs' are clearly not sufficient under Fifth Circuit and Supreme Court precedent[,]" (ECF No. 128, PageID.2854) (citations omitted), is absurd and incorrect. Somehow, Defendants read *Dockery v. Cain*, 7 F.4th 375 (5th Cir. 2021), as standing for the proposition that the conditions prisoners experience must be considered in isolation and may not be considered together. (ECF No. 128, PageID.2854). The plain language of that opinion, and the decisions it relies upon expressly refute Defendants' argument.[32]

Specifically, while the *Dockery* Court did note that "[n]othing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists," the Court immediately qualified that rule by stating, "[i]t is true that courts must consider conditions together if 'they have a mutually reinforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth or exercise.'" *Dockery*, 7 F.4th at 378 (quoting *Wilson v. Seiter*, 501 U.S. 294, 304–305 (1991)). *See also Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) ("Conditions of confinement may establish and Eighth Amendment violation 'in combination' when each would not do so alone, but only when they

---

[32] Additionally, this Court can consider a hypothetical. In three different prisons cleaning agents are stored improperly causing them to leak on the floor. In the first, bleach is stored improperly causing a puddle to accumulate in an area near where prisoners sleep and/or eat. In the second, ammonia is stored improperly causing a puddle to accumulate in an area near where prisoners sleep and/or eat. Without more, it is highly unlikely that either of these first two situations constitute an Eighth Amendment violation. However, in the third prison *both* bleach and ammonia are stored improperly, causing them to puddle together and generating a cloud of chlorine gas near where inmates sleep and/or eat. This would certainly amount to an Eighth Amendment violation (assuming that the prison officials were aware and failed to act). Yet under Defendants' theory, because neither the improper storage of bleach nor ammonia on its own violated the Eighth Amendment, prisoners would have no constitutional claim. Fortunately, the binding caselaw clearly demonstrates that prisoners in the third hypothetical prison would have a constitutional claim.

have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise – for example, a low cell temperature at night combined with a failure to issue blankets.") (quoting *Seiter*, 501 U.S. at 304). Here, where all the conditions Plaintiffs and members of the putative class endured combine to create a situation where they are constantly at risk of serious harm and Defendants did nothing to mitigate this risk, Plaintiffs have properly pled an Eighth Amendment claim. In fact, Plaintiffs were constantly confronted with two independent risks of harm. First, Plaintiffs faced a constant risk of physical violence from other inmates and staff.[33] Second, Plaintiffs faced a constant risk of harm from the environmental conditions at Parchman. Plaintiffs' operative complaint clearly identifies the circumstances – faced by all Plaintiffs and willfully ignored by all Defendants – that created the risks associated with the environmental conditions. The environmental conditions can generally be broken down into categories: 1) food; 2) structural conditions; 3) and hygiene. However, it is critical to note that these conditions were all mutually reinforcing amongst themselves and with respect to the risk of violence. (*See* ECF No. 75, PageID.2468, ¶68) ("The neglected state of prison facilities fosters and environment for squalor and violence.").

Regarding food, Plaintiffs have properly alleged that:

> The kitchen facilities at Parchman are abysmal; the recent annual inspection by the Mississippi Health Department in June 2019 lambasts the conditions, finding containers of dried, spoiled and molded food, flies and other pests, food maintained in coolers at unsafe temperatures, collapsing ceilings and other unhealthy food preparation and storage conditions.

(ECF No. 75, PageID.2467, ¶62).

---

[33] Addressed *supra*.

Plaintiffs also alleged that "[a]t times there are no meals, and sometimes only one per day . . . [and] When served, the 'food' is cold, rotten and often containing rocks, insects, bird droppings and rat feces." (ECF No. 75, PageID.2469, ¶¶75–76). It is unclear how being served food that is spoiled or rotten, stored at "unsafe temperatures", and/or containing "rocks, insects, bird droppings and rat feces" does not pose a significant risk of harm to Plaintiffs and members of the putative class.[34] A reasonable inference is that Plaintiffs were exposed to a significant risk of harm from food poisoning, parasites or other diseases transmitted by feces, and oral and intestinal injuries from the rocks. Additionally, Plaintiffs' complaint that they were not consistently served meals exacerbates the risks associated with the already dangerous food. (ECF No. 75, PageID.2469, ¶75). Logically, if one is hungry enough, they may ignore that there is rat or bird feces in their food, or they may not even bother to look for those adulterants or rocks before eating. Furthermore, the food issues were reinforced by the presence of vermin inside the facility that would "attack [prisoners'] food," (ECF No. 75, PageID.2469, ¶71), when Plaintiffs attempted to purchase food from commissary to avoid the risks associated with the food that was provided to them, the vermin got it.

While Plaintiffs' Complaint clearly alleges that *all* Plaintiffs and members of the putative class experienced these conditions, it is not even necessary to establish that each Plaintiff was personally on the losing side of the spoiled, rotten, waste and rock filled food game of Russian roulette that Defendants played. As the Supreme Court stated in *Farmer*:

---

[34] Alone, the "food maintained in coolers at *unsafe* temperatures" demonstrates that Plaintiffs were exposed to a risk of significant harm from being served "unsafe" food.

Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of an obvious substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault . . . and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk."

*Farmer*, 511 U.S. at 843 (internal quotation and citation omitted).

Regarding structural conditions, Plaintiffs have properly alleged:

In its June 2019 inspection of Parchman the Mississippi Department of Public Health further found "more than 400 cells with problems such as flooding and leaks, lack of lights, power and water, broken toilets and sinks, broken windows and bird nests, as well as missing pillows and mattresses" . . . Hundreds of other environmental deficiencies were also identified by the inspection, including exposed wiring and mildew. MDOC itself has described Unit 29 of Parchman as "unsafe for staff and inmates because of age and general deterioration.

******

In some instances, prisoners are confined in premises' that have been legally condemned as unsafe for human habitation without regard for the condemnation orders. Where toilets are not functioning, inmates are forced to void in sinks where they must then use for sanitation, or in plastic bags provided by staff.

******

Toilets overflow with sewage which spills out and remains on the floors. Potable water from available sources is contaminated with human waste and brown in color. Rain leaks from the roof streaming through multiple cells and causing black mold to grow on walls and surfaces where inmates sleep.

(ECF No. 75, PageID.2467–69, ¶¶63, 69–70, 72–74).

These already unconstitutional structural conditions are mutually reinforcing with the unconstitutional hygienic conditions. Specifically, the inability to shower for extended periods of time. (ECF No. 75, PageID.2467, ¶63). Assuming, arguendo, that denying Plaintiffs' the ability to shower for weeks is alone not a violation of the Eighth Amendment, when considered in light of the human waste pooling in cells from overflowing toilets, and bags of waste present in the

22

facility it clearly crosses the threshold of being "so 'base, inhuman and barbaric' that they violate the Eighth Amendment." *Palmer v. Johnson*, 193 F.3d 346, 352 (1999) (citation omitted). The same can be said of rats, insects, and other vermin. Plaintiffs were denied basic hygiene in circumstances where the prison teemed with vermin that would "crawl over inmates while they sleep and attack their food." (ECF No. 75, PageID.2468, ¶71). Furthermore, exposed wires by themselves pose a significant risk of harm, a risk that is only exacerbated when considered in conjunction with flooding, leaking roofs, and water from broken toilets. Lighting conditions can obviously create a risk of harm from falling and injuring oneself. This might not be sufficient if Parchman was a minimally maintained and patrolled facility. However, once again the inadequate lighting simply exacerbates the other risks such as exposed wires, bags of human waste, pools of feces, and of course, violence.

The proverbial nail in the coffin regarding the conditions, both environmental and risk of violence, is Plaintiffs' allegation that "[i]nmates have resorted to setting fires to compel officials to enter their building and hopefully render life-saving care to fellow inmates who are sick and dying or to save themselves from violence." (ECF No. 75, PageID.2469, ¶81). To obtain assistance for serious injuries and life-threatening situations, members of the putative class were had to create yet another dangerous situation, fire inside an enclosed space *or they would not receive any assistance*. A decision declaring that prison officials may so thoroughly ignore the needs of prisoners to create a situation where fires are necessary to obtain assistance in life-threatening circumstances would be contrary to the common sense, human decency, and the well-established case law of the Fifth Circuit and Supreme Court.

For these reasons, Plaintiffs have properly pled that Defendants violated their clearly established Eighth Amendment rights and Defendants' Motion must be denied.

C. This Court Should Exercise its Discretion and Deny Defendants' Fed. R. Civ. P. 54(b) Motion

Fed. R. Civ. P. 54(b) provides courts with the authority to revise any decisions or orders that adjudicate fewer than all of the pending claims. Whether a court grants a motion to revise a prior order or decision under this rule "is discretionary." *Stuntz v. Ashland Elastomers, LLC*, No. 1:14-CV-00173-MAC, 2018 U.S. Dist. LEXIS 219524 (E.D. Tex. Dec. 7, 2018) (citing *McKay v. Novartis Pharm. Corp.*, 751 F.3d 694, 701 (5th Cir. 2014). To the extent that this Court is inclined to partially vacate its prior Order and dismiss Plaintiffs' claims against Defendants other than Turner based on the technical pleading arguments[35] Defendants make in their Motion, it should exercise its discretion not to grant Defendants' Motion to Vacate.

There is a very simple reason for this Court to decline to exercise its discretion to grant such a motion, it would render a significant injustice. Defendants had more than four months to file a motion for reconsideration or motion to vacate under this rule. In that time, Plaintiffs opted to not take the opportunity this Court provided them to make final amendments to their Complaint because they did not want to delay progress in the case and were looking toward class certification discovery and motion practice. (ECF No. 100, PageID.2621) (providing a deadline to file a motion to amend pleadings of December 15, 2021). Had Plaintiffs' known that Defendants would attempt to rehash their motion to dismiss based on their claims of shotgun pleadings and lack of specificity, they may have very well taken the opportunity in December of

---

[35] Plaintiffs understand Defendants' Motion to focus on the *form* of Plaintiffs' allegations, rather than the substance.

2021, to add more specific factual allegations to avoid this unnecessary motion practice.[36] Additionally, the Parties have already engaged in significant discovery,[37] providing an abundance of facts that Plaintiffs are prevented from using in response to Defendants' Motion. For this reason, granting Defendants' motion to vacate its prior order on technical pleading grounds is unjust because the basic purpose of pleading is to provide defendants notice of the claims against them. *See Euramerica Gas & Oil Corp. v. Brilind Energy LLC*, 2018 U.S. Dist. LEXIS 244669 (N.D. Tex. Apr. 20, 2018) (noting that shotgun complaints "are problematic because they frustrate the purpose of notice pleading and impair a defendant's ability to respond to an asserted claim.") (citation omitted). At this point, Defendants have deposed Plaintiffs and have a much clearer understanding of the claims against them.[38] For example, Defendants are well aware where, when, and for how long each Plaintiff was exposed to the conditions complained of. If Defendants want to claim that there were no unconstitutional conditions at Parchman, that they were unaware of those conditions, or that they took reasonable steps to

---

[36] To be clear, Plaintiffs firmly believe that their Complaint contains sufficient factual allegations to easily survive Defendants' Motion. However, if a simple amendment adding a few paragraphs would have avoided this current Motion, Plaintiffs likely would have taken the opportunity offered by this Court.

[37] Of Plaintiffs only. Plaintiffs responded to Defendants' Discovery Requests and the Named Plaintiffs, except one who Counsel has been unable to locate, have all sat for depositions totaling dozens of hours over a period of weeks. Defendants on the other hand, have not provided any responses to Plaintiffs' Discovery Requests, no Defendant has sat for a Deposition, and none of the documents identified in Defendants' Initial Disclosures have been produced. To be clear, Plaintiffs are not alleging any improper conduct on the part of Defendants. Rather, Plaintiffs are simply pointing to the extensive discovery on factual issues that has already been conducted and that, assuming this Court were inclined to grant Defendants' Motion to Vacate it would be unjust.

[38] At least Defendants' Counsel does. Certain depositions are still being treated in their entirety as "Confidential – Attorneys' Eyes Only" during the pendency of this Motion.

mitigate those conditions, they will have a complete opportunity to litigate those factual issues on a motion for summary judgment once discovery has been conducted.

For these reasons, even if this Court were persuaded by Defendants' arguments pertaining to alleged conclusory allegations or insufficient pleadings, it should nonetheless exercise its discretion to not grant Defendants Fed. R. Civ. P. 54(b) Motion.

IV.     Conclusion

WHEREFORE, Plaintiffs respectfully request that this Court deny Defendants' Motion to Dismiss Plaintiffs' Fifth Amended Complaint Against Marshall Turner and to Partially Vacate Prior Order [DOC. 87] Under Rule 54 and award Plaintiffs costs and reasonable attorney fees incurred as a result of responding to this motion.

Respectfully Submitted,

Date: April 11, 2022                    /s/ Paul Matouka

Paul Matouka (MI State Bar No. P84874)*
OLIVER LAW GROUP P.C.
Attorneys for Plaintiffs
1647 W. Big Beaver Rd.
Troy, MI 48084
T: (248) 327-6556
E: notifications@oliverlawgroup.com
*admitted *pro hac vice*

/s/ Arthur Calderón

Arthur Calderón
CALDERON LAW
Attorneys for Plaintiffs
103 S. Court St. #101
T: (662) 594-2439
E: arthur@msdeltalaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 11, 2022, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing toall parties that are CM/ECF participants in this action.

/s/ Paul Matouka  
Paul Matouka (P84874)
