# *Measuring Violations of Human Rights*
## *An Empirical Analysis of Awards in Respect of Non-Pecuniary Damage under the European Convention on Human Rights*

*Szilvia Altwicker-Hàmori[*] / Tilmann Altwicker[**] / Anne Peters[***]*

Abstract: This is the first study to examine the awards made by the European Court of Human Rights in respect of non-pecuniary damage from an empirical perspective. It uses a multiple regression analysis based on data (929 cases) drawn from the Council of Europe's Human Rights Documentation (HUDOC) database. By legal analysis we identified three elements of the "equity principle" used by the Court for the calculation of awards made in respect of non-pecuniary damage (seriousness of the violation, applicant- and overall context-related factors), which we used in our regression analysis. Our empirical results show that there is a statistically significant association between the amount awarded in respect of non-pecuniary damage and the intensity of the violation, the existence of a separate opinion, the respondent state and the fact whether the applicant is a legal or a natural person. Our study therefore contradicts the view voiced in the literature that awards made in respect of non-pecuniary damage under the ECHR are "unpredictable" and "inconsistent".

---

[*] Research Fellow, Zurich University of Applied Sciences, School of Health Professions, Centre for Health Sciences. Dr., M.Sc. Econ (LSE).
[**] Lecturer, University of Basel. Dr., LL.M. (CEU).
[***] Director at the Max Planck Institute for Comparative Public Law and International Law. Prof. Dr., LL.M. (Harvard).
The authors are grateful to Fin Langmack, Viktor Kilinski, and Robert Stendel for their excellent research assistance.

Electronic copy available at: https://ssrn.com/abstract=2631404

**EXHIBIT 5**

I.   Introduction ........................................................................................ 4

II.  Terminology ...................................................................................... 5

    1.  Just Satisfaction in Art. 41 ECHR .................................................. 5

    2.  Damage and Harm ......................................................................... 6

    3.  Reparation, Damages, and Compensation in other Areas of International Law 8

III. The Concept of Awards in Respect of Non-Pecuniary Damage under Art. 41 ECHR ................................................................................................ 10

    1.  Rationale.......................................................................................... 10

    2.  Legal Requirements for Art. 41-Awards .......................................... 13

    3.  The "Injured Party" ......................................................................... 15

IV.  Calculating the Award in Respect of Non-Pecuniary Damage ........................... 16

    1.  The Court's "Equity" Principle ......................................................... 16

        a)  Seriousness of the Violation.......................................................... 18
        b)  Applicant-Related Factors............................................................. 19
        c)  Overall Context-Related Factor..................................................... 20
    2.  Limited Standardization ................................................................. 22

V.   Data ................................................................................................. 22

    1.  Sample Selection ............................................................................ 22

    2.  Unit of Analysis .............................................................................. 24

    3.  Variables........................................................................................ 25

        a)  Amount Awarded in Respect of Non-Pecuniary Damage........................ 26
        b)  Seriousness of the Violation........................................................... 26
        c)  Applicant-related Factors............................................................... 28
        d)  Overall Context-Related Factor...................................................... 28
        e)  Court-Related Factor..................................................................... 29
VI.  Empirical Model and Estimation Results ........................................................ 30

    1.  Empirical Model ............................................................................. 30

    2.  Estimation Results .......................................................................... 32

VII. Discussion........................................................................................ 33

    1.  Intensity of the Violation.................................................................. 33

Electronic copy available at: https://ssrn.com/abstract=2631404

a) Life, Physical and Mental Integrity..................................................... 33
b) Private and Family Life..................................................................... 34
c) Procedural Justice............................................................................ 35
d) Property.......................................................................................... 37
e) Personal and Political Liberty ........................................................... 37
f) Physical Liberty ............................................................................... 38
2. Applicant- and Overall Context-Related Factors............................................ 40
3. Court Related-Factor ................................................................................... 40
VIII. Conclusion .................................................................................................... 40
Appendix A: Coding and Description of Variables ................................................ 44
Appendix B: Descriptive Statistics ...................................................................... 49
Appendix C: Estimation Results .......................................................................... 50

Electronic copy available at: https://ssrn.com/abstract=2631404

## I.  Introduction

The European Convention on Human Rights (ECHR)[1] allows the European Court of Human Rights (the Court; the ECtHR) to "afford just satisfaction" to an "injured party", besides simply finding and stating the human rights violation (Art. 41 ECHR). Art. 41-awards, notably those relating to non-pecuniary damage suffered, are often criticized for their inconsistency, subjectivity, lack of reasoning and the resulting unpredictability. Franz Bydlinski found that "the assessment practice does not seem at all consistent" and deplores a "lack of transparency".[2] A recent study concludes that "the practice in respect of compensation for moral prejudice is rather unpredictable."[3] Others criticize the "global-intuitive quantification of the damages."[4] Dinah Shelton writes that the "European Court of Human Rights damage awards for non-pecuniary harm are difficult to comprehend other than as subjective judgments about the moral worth of the victim and the wrongdoer."[5] The Court has not disclosed the exact principles guiding its awards made in respect of non-pecuniary damage. It does not seem overstated to say that "just satisfaction" is the least reasoned part in the Court's jurisprudence.

Given this criticism and the lack of information available from the Court, this study examines the principles behind awards in respect of non-pecuniary damage. This is the first study to approach this topic from an empirical perspective. We use a multiple regression analysis based on data (N=929) drawn from the Council of Europe's Human Rights Documentation (HUDOC) database.[6]

---

[1] Article 41 of the Convention for the Protection of Human Rights and Fundamental Freedoms, Nov. 4, 1950, 213 UNTS 221, as amended by Protocol Nos. 11 and 14, June 1, 2010, ETS No. 155.

[2] Franz Bydlinski, *Methodological Approaches to the Tort Law of the ECHR, in* Tort Law in the Jurisprudence of the European Court of Human Rights para. 176 (Attila Fenyves, Ernst Karner, Helmut Koziol & Elisabeth Steiner eds., 2011) ("The assessment practice of the Court with regard to ... non-pecuniary damage can be described mainly under the aspect of case-oriented Court discretion, albeit unfortunately mostly without any highlighting of the circumstance considered material in the respective case"). *See also, ibid.,* paras. 177 and 187.

[3] Octavian Ichim, Just Satisfaction under the European Convention on Human Rights 121 (2015).

[4] Christa Kissling & Denis Kelliher, *Compensation for Pecuniary and Non-Pecuniary Loss, in* Tort Law in the Jurisprudence of the European Court of Human Rights 579, 584 (Attila Fenyves, Ernst Karner, Helmut Koziol & Elisabeth Steiner eds., 2011).

[5] Dinah Shelton, Remedies in International Human Rights Law 345 (2d ed. 2005).

[6] The HUDOC database is available *at* hudoc.echr.coe.int. *See* "HUDOC Manual" at http://www.echr.coe.int/Documents/HUDOC_Manual_2012_ENG.pdf for a description of the HUDOC database. All Articles refer to the ECHR (if not indicated otherwise).

Electronic copy available at: https://ssrn.com/abstract=2631404

The empirical analysis of the Court's practice sheds light on the association between the amount awarded in respect of non-pecuniary damage and the intensity of the violation (and other factors). Our analysis thus complements the typical legal (doctrinal) analysis. The purely doctrinal analysis follows the binary logic of "violation" or "no violation", and – as the finding of a court – it has the merit of producing an unequivocal result. The clarity comes at a cost, though. The binary logic does not accommodate the intuition that certain violations of human rights are more severe than others, or – put differently – that they create different degrees of harm. For example, the violation appears more severe if a person is tortured by state agents than if a person's property is confiscated by the state. In contrast to the binary legal analysis, an empirical analysis allows us to capture different levels of injustice.

We proceed as follows: Section II clarifies key concepts relating to awards of just satisfaction under the ECHR. Section III outlines the concept and purpose of awards in respect of non-pecuniary damage under Art. 41. For convenience sake, we will sometimes call those "Art. 41-awards", leaving out all awards under Art. 41 which do not deal with non-pecuniary damage. Section IV explains how the Court uses the equity-principle for calculating the awards in respect of non-pecuniary damage. Section V proceeds with a description of how our HUDOC-based dataset was prepared for the empirical analysis. The empirical model and the estimation results are described in Section VI. The results of the regression analysis are discussed in Section VII. Section VIII concludes. Tables and figures are presented in Appendices A – C.

## II.    Terminology

### 1.    *Just Satisfaction in Art. 41 ECHR*

"Just satisfaction", the term used in the Convention, means a monetary payment for the damage suffered by the victim of a human rights violation. This study uses "harm", "prejudice" or "grievance" as synonyms for "damage" (see in detail below). The text of the Convention itself avoids the terms "damage" or "harm". It only mentions *the state response* required after the state has violated a human right (and potentially caused damage thereby). This response is called "satisfaction" in the Convention.

Electronic copy available at: https://ssrn.com/abstract=2631404

The text of Art. 41 itself seems to use "satisfaction" interchangeably with "reparation": by prescribing that the Court may only award "just satisfaction" "if the internal law of the High Contracting Party concerned allows only partial *reparation* to be made". Also during the drafting process, the terms "satisfaction", "reparation", and "compensation" have all been employed seemingly without distinction.[7] The Court's Practice Directions use the terms "financial compensation", "monetary award" or "award in respect of pecuniary/non-pecuniary damage" in order to circumscribe and paraphrase the Convention's term "just satisfaction".[8]

"Just satisfaction" (granted in the form of money) may be afforded under Art. 41 in respect of three types of loss: pecuniary damage, non-pecuniary damage, and costs and expenses[9] (Rule 6 of the Court's Practice Directions). This paper examines only the second possible trigger of just satisfaction, non-pecuniary damage. It does not deal with the first trigger, with pecuniary (i.e. financial, economic) damage.

## 2. *Damage and Harm*

Neither the Convention itself nor the Court's case-law defines "damage".[10] The ECtHR seems to use "damage" and "harm" interchangeably. For example, the Court's Practice Directions use "non-material *harm*, for example mental or physical

---

[7] The Draft convention presented by the European Movement to the Committee of Ministers of the Council of Europe in July 1949 foresaw that the Court could prescribe "measures of reparation". (Doc. CDH(70)17, April 30, 1970, 2). This formula ("measures of reparation") was taken up by various delegates in the first Session of the consultative Assembly of the Council of Europe (August-September 1949), (*ibid.* 4). The preparatory report of the Secretariat General of the Council of Europe mentioned in its list of questions raised for drawing up the draft convention the "question of the competence of the Court to pronounce judgments amending [sic!] *damages, restitutions in kind (restitutio in integrum) or moral damages* (…)." Undated report, reprinted *ibid.* 17. Only in the committee of experts, the Italian delegate, Mr. Perassi, for the first time introduced the term "just satisfaction" in his proposed amendment for what then became Article 36 of the preliminary draft Convention (February 7, 1950). (*ibid.* 18 and 20). In his capacity as rapporteur of the legal committee, Teitgen proposed that the Court be empowered to "declare the impugned legislative, executive, or judicial acts to be null and void." (Legal Committee, preliminary draft, August 17, 1950), reprinted in Doc. CDH(70)17 of April 30, 1970, 28. In that text, he preferred the term "just *compensation*", and introduced it in his amending proposal. But his proposal was rejected by the legal committee in favor of leaving the draft text ("just *satisfaction*") as previously approved by the Committee of Ministers as it was. The reason was to deny the Court any power of annulment concerning domestic legal acts. The terminology "reparation" or "satisfaction" apparently did not play any role here. (Doc. CDH(70)17, April 30 1970, 29).

[8] European Court of Human Rights, *Practice Directions: Just Satisfaction Claims* (July 1, 2014), *at* http://www.echr.coe.int/Documents/PD_satisfaction_claims_ENG.pdf, *e.g.* paras 2, 13, 24.

[9] "Costs and expenses" are those incurred by the applicant "in trying to prevent the violation from occurring, or in trying to obtain redress therefor [sic]", *e.g.* court registration fees or costs of legal assistance, Practice Directions (*supra* note 8), para. 16,

[10] *Cf.* Ken Oliphant & Katarzyna Ludwichowska*, Damage, in* Tort Law in the Jurisprudence of the European Court of Human Rights 397 (Attila Fenyves, Ernst Karner, Helmut Koziol & Elisabeth Steiner eds., 2011).

Electronic copy available at: https://ssrn.com/abstract=2631404

suffering", as a synonym for "non-pecuniary damage".[11] For the purpose of this paper it is therefore not necessary to distinguish "damage" from "harm".

The damage triggering the Art. 41-award maybe "pecuniary" (syn. "material") or/and "non-pecuniary" (syn. "immaterial" or "moral"). Pecuniary damage is, according to the Court, the "loss actually suffered as a direct result of the alleged violation".[12] It is a damage which involves the decrease of the economic wealth or fortune of a person. It can therefore be calculated by relying on market prices. That loss may also take the form of lost profits. It must have been actually suffered or expected. Examples are the loss of property which has been taken in violation of the Convention or costs for medical treatment needed due to physical injury which resulted from a violation of the right to physical integrity, e.g. police violence. In response to such pecuniary damage, the sum of the satisfaction awarded by the Court will usually reflect the full calculated amount of the damage.[13] According to the Practice Directions, "[t]he principle with regard to pecuniary damage is that the applicant should be placed, as far as possible, in the position in which he or she would have been had the violation found not taken place, in other words, *restitutio in integrum*".[14] In the Court's words, the "respondent State is expected to make all feasible reparation for the consequences of the violation in such a manner as to restore as far as possible the situation existing before the breach".[15] The applicant bears the full burden of proof for any pecuniary damage alleged.[16]

In contrast, non-pecuniary is damage which does not involve a diminution of the victim's patrimony, it cannot be priced on the market. Therefore, the sum awarded will inevitably be conventional (i.e. governed by social convention) as opposed to economically "rational" (determined by demand and supply on a market).

Many human rights violations directly or indirectly cause pecuniary damage, for example the loss of working capacity through a violation of the right to physical integrity. However, non-pecuniary, immaterial damage is the more typical harm

---

[11] Practice Directions, *supra* note 8, para. 13.
[12] *Beshiri and Others v. Albania*, App. No. 7352/03 (Eur. Ct. H.R. August 22, 2006), para. 111.
[13] Practice Directions, *supra* note 8, para. 12.
[14] Practice Directions, *supra* note 8, para. 10.
[15] *Stolyarova v. Russia,* App. No. 15711/13 (Eur. Ct. H.R. January 29, 2015), para. 75.
[16] Elisabeth Steiner, *Just Satisfaction under Art 41 ECHR: A Compromise in 1950 – Problematic Now, in* TORT LAW IN THE JURISPRUDENCE OF THE EUROPEAN COURT OF HUMAN RIGHTS 14 (Attila Fenyves, Ernst Karner, Helmut Koziol & Elisabeth Steiner eds., 2011).

Electronic copy available at: https://ssrn.com/abstract=2631404

caused by human rights violations. It is the trauma, anxiety, anger, etc. coming with the attack on human dignity, the loss of trust in state institutions, the loss of beloved persons, the mental and physical pain lasting after torture, imprisonment, censorship, separation from family members, and so on. Although such immaterial harm can by definition never be "remedied" by money, most legal systems or legal instruments, including the ECHR, foresee the possibility to award money to persons who suffered such harm. For example, the Court's Practice Directives state that an award of just satisfaction may "provide financial compensation for non-material harm".[17]

In European tort law, "damage" and "harm" are often used interchangeably as well, with "harm" being the more "natural kind" notion, and "damage" being the accompanying legal term.[18] In the international law of state responsibility, "damage" refers to "material or other loss suffered".[19] Here "damage" appears to be the narrower concept (coming in the form of either "material" or "moral" damage), while "harm" is the wider concept, encompassing in addition to damage all sorts of interferences with concerns or general interests.[20]

In the ECHR-context, "damage" is any sufficiently serious harm to a legal interest protected by the Convention. Indeed, the Convention rights shape the protection of specific human interests. For example, the right to fair trial (Art. 6) and the right to an effective remedy (Art. 13) both protect the legal interest of "procedural justice".

### 3.    Reparation, Damages, and Compensation in other Areas of International Law

In general international law, a different set of terms relates to the wrongdoer's *response* to the harm done. The first is "damages" in the plural (*dommage-intérêt; Schadenersatz*). "Damages" are a special form of "reparation". "Reparation" means correction or rectification (by the wrongdoer) of the harm caused. If those damages

---

[17] Practice Directions, *supra* note 8, para. 13.

[18] Article 2:101 of the Principles of European Tort Law states that "[d]amage requires … harm to a legally protected interest." The commentary says that "harm to a legally protected interest is damage and the words are effectively synonymous." The transnational, non-binding Principles of European Tort Law have been drafted by a transnational network of academic experts on tort law, and seek to prepare the harmonization of tort law throughout Europe (EUROPEAN GROUP ON TORT LAW, PRINCIPLES OF EUROPEAN TORT LAW: TEXT AND COMMENTARY 27-28 (2005)).

[19] JAMES CRAWFORD, STATE RESPONSIBILITY: THE GENERAL PART 55 (2013).

[20] *See* Article 31 (Reparation) of the Articles on Responsibility of States for Internationally Wrongful Acts, with commentaries, YRBK INT'L LAW COMMISSION, 2001, VOLUME II, UN Doc A/CN.4/SER.A/2001/Add.1 (Part 2), 91 para. 5.

Electronic copy available at: https://ssrn.com/abstract=2631404

relate to immaterial harm, they are mostly called "moral damages"/"dommage moral".[21] "Reparation" may be owed in kind or (especially if the restoration of the *status quo ante* is not possible) in form of money (then also called "compensation").

In the terminology of the general international law on state responsibility – which arguably also governs the responsibility of the States Parties to the Convention for violations of any of its provisions –[22] the ECtHR's award granting money (called "just satisfaction" in the ECHR) in respect of non-pecuniary damage would fall under the heading of "compensation" in the sense of Art. 36 of the ILC Articles on the Responsibility of States for Internationally Wrongful Acts.

This means that "just satisfaction" in Art. 41 seems to have a different meaning than the term "satisfaction" as nowadays used in the general international law of state responsibility.[23] Art. 37 ILC Articles simply speaks of "satisfaction", meaning, as its second paragraph states, "acknowledgement of the breach, an expression of regret, a formal apology or another appropriate modality".[24] The part of an ECHR-judgment simply finding (stating) the human rights' violation would have to be considered as a kind of "satisfaction" in the ILC-sense.

In the context of universal human rights and international humanitarian law, a catch-phrase is the "right to remedy and reparation".[25] In the terminology of that area of the law, "reparation" is the content of a secondary claim arising from international (state) responsibility for a violation of international norms on human rights. "Reparation" here

---

[21] *See, e.g., Zullo v. Italy*, App. No. 64897/01, (Eur. Ct. H.R. November 10, 2004), para. 25: "non-pecuniary damage, which is the anxiety, inconvenience and uncertainty caused by the violation, and other non-pecuniary loss."

[22] The commentary on the preliminary draft Convention underscored the conformity of the projected power of the Court to grant just satisfaction with the general rules of international law: "This provision is in accordance with the actual international law relating to a violation of an obligation by a State. In this respect, jurisprudence of a European Court will never, therefore, introduce any new element or one contrary to existing international law." Doc. CDH(70)17, April 30, 1970, 21.

[23] When the ECHR was drafted in 1950, the legal framework and legal terminology of the law of state responsibility was not yet fully elaborated and was not codified.

[24] International Law Commission, Responsibility of States for internationally wrongful acts, *supra* note 20.

[25] UNGA, Basic Principles and Guidelines on the Right to a Remedy and Reparation for Victims of Gross Violations of International Human Rights Law and Serious Violations of International Humanitarian Law, UN Doc. A/Res/60/147 (March 21, 2006). In scholarship Pablo de Greiff, The Handbook of Reparations (2006); Carla Ferstman, Mariana Goetz & Alan Stephens, Reparations for Victims of Genocide, War Crimes and Crimes against Humanity: Systems in Place and Systems in the Making (2009).

Electronic copy available at: https://ssrn.com/abstract=2631404

mostly denotes the substantive claim while "remedy" is primarily understood to be a procedural claim to legal protection, but the terminology is not consistent.[26]

## III.   The Concept of Awards in Respect of Non-Pecuniary Damage under Art. 41 ECHR

Art. 41 reads as follows: "If the Court finds that there has been a violation of the Convention or the Protocols thereto, and if the internal law of the High Contracting Party concerned allows only partial reparation to be made, the Court shall, if necessary, afford just satisfaction to the injured party."

### 1.   Rationale

During the drafting history, the Court's authority to "grant redress" (in form of just satisfaction) was perceived as underscoring the *juridical* quality of the proclaimed human rights: "*therefore*, this list of rights acquire a value which is not only moral and philosophical, but also legal".[27]

Although all violations of Convention rights engender immaterial harm simply by the fact of curtailing the victim's liberty or equality in an unjustified way, the Court finds (sufficiently serious) non-pecuniary damage only in "situations where the applicant has suffered evident trauma, whether physical or psychological, pain and suffering, distress, anxiety, frustration, feelings of injustice or humiliation, prolonged uncertainty, disruption to life, or real loss of opportunity".[28]

The basic problem for any legal system or legal instrument foreseeing financial payments for immaterial damage (bodily pain, mental anguish, loss of life time, etc.) is that such damage can never be truly compensated with material goods or money. Still, many legal systems allow or mandate courts to order payments. The question is most relevant in the framework of tort law. Here, the tortfeasor's obligation to pay money for the non-pecuniary loss he caused is explained and justified by different rationales. The payment fulfills "an important function in providing solace" for the

---

[26] Sometimes, "remedy" is split into a procedural and a substantive aspect (as in Principle 11 of the GA Principles 2006 (*supra* note 25)).

[27] Consultative Assembly, plenary sitting of August 14, 1950, Italian delegate, Doc. CDH(70)17, April 30, 1970, 26.

[28] *Varnava and others v. Turkey*, App. Nos. 16064/90, 16065/90, 16066/90, 16068/90, 16069/90, 16070/90, 16071/90, 16072/90, 16073/90, (Eur. Ct. H.R. September 18, 2009), para. 224.

Electronic copy available at: https://ssrn.com/abstract=2631404

victim, "in affirming human dignity and in sanctioning inappropriate behavior".[29] Although the tort law-functions, governing relationships between private individuals, cannot be simply transferred to the relationship between the state and persons harmed by state action, the basic rationale of the payment does seem to be similar.

The purpose of awards on just satisfaction has been explained by the Court as follows: They "serve to give recognition to the fact that moral damage occurred as a result of a breach of a fundamental human right and reflect in the broadest of terms the severity of the damage; they are not, nor should they be, intended to give financial comfort or sympathetic enrichment at the expense of the Contracting Party concerned".[30] The special nature of Convention rights as individual rights is mirrored in the rationale for awards on non-pecuniary damage: These awards serve the interests of the aggrieved individuals. They are not intended to serve some collective interest, such as the public interest in punishing a wrongdoing state[31] or in rendering respect for human rights more effective in general. The purely individual-focused rationale of the Court's power to grant financial "satisfaction" was clearly apparent in the Convention's drafting stage. During that process, the projected Court's power to award "satisfaction" ("damages", or "reparation") was accepted by all sides. The point of controversy was rather the Court's authority to annul domestic legal acts – which was ultimately rejected by the authors of the Convention. Exactly in the context of that bigger controversy, the purely individual-focused monetary relief (as opposed to removing the root causes of violations by annulling state acts) was criticized. The point of criticism was that "reparation in cash", as the French delegate, Pierre-Henri Teitgen, called it, i.e. money awarded to the grieved individual, might distract from the systemic problems in the state. Rhetorically, Teitgen asked: "But can the graver form of violation which consists in removing a fundamental law guaranteeing a specific freedom or the whole nation, […] can such a violation be redressed by awarding a symbolic farthing damages to the citizens of the country?"[32] It is (only) that "symbolic

---

[29] WV Horton Rogers, *Commentary on Article 10:301, in* EUROPEAN TORT LAW PRINCIPLES, *supra* note 18, at 172.

[30] *Varnava and others v. Turkey, supra* note 28, para. 224.

[31] *Cf.* also Practice Directions (*supra* note 8), para. 9. Therefore, responsibility under Article 41 is not about "punishing" the contracting state for a past wrong. 'Fault' on the side of the state organs is not a necessary requirement for awarding just satisfaction, *see* BYDLINSKI, *supra* note 2, para. 57. This is in line with the law on state responsibility which does not rely on "fault" either. The reason is that, generally speaking, the idea of "fault" is difficult to apply to legal (as opposed to natural) persons.

[32] Consultative Assembly, plenary sitting, August 14, 1950, French Delegate, Doc. CDH(70)17, April 30, 1970, at 27.

Electronic copy available at: https://ssrn.com/abstract=2631404

farthing" which has been retained by the drafters. So the primary aim of awards on non-pecuniary damage under the Convention is to "compensate" the individual for the immaterial harm suffered.[33] In this regard, any notion of "full" compensation for non-material harm would be misplaced anyway. But monetary compensation for non-material harm – although imperfect – seems an acceptable form of justice instead of a hypothetical ideal form of justice.

In addition to the compensatory motivation behind non-pecuniary damage awards, in some jurisdictions, the rationale of granting money in response to non-pecuniary damage is that such money will allow victims to enjoy life (again) after the trauma, by permitting them to buy goods which help them to do so.[34] This non-compensatory rationale may also be squared with the awards under Art. 41. It should, however, not be considered the main rationale, because it presupposes the capacity to sentience and self-consciousness, e.g. the mental capacity to feeling enjoyment. This can be a problem precisely in cases involving the gravest violations of human rights, e.g. torture, depriving the victim of that capacity.[35]

The Court does not require "any proof of the non-pecuniary damage he or she sustained".[36] Instead, the Court applies an "evidentiary criterion", acting on the rebuttable presumption that the violation of the Convention right engendered non-pecuniary damage.[37] The reason is that many forms of non-pecuniary damage are by their nature not amenable to proof.[38] The rebuttable presumption on non-pecuniary damage apparently applies no matter which Convention right has been violated. The Court bases its assumption on the consideration that an average person in the situation of the applicant would in fact suffer such damage.[39] Furthermore, while the

---

[33] Oliver Dörr, *Entschädigung und Schadensersatz, in* KONKORDANZKOMMENTAR ZUM EUROPÄISCHEN UND DEUTSCHEN GRUNDRECHTSSCHUTZ 2148, 2174 (Rainer Grote & Thilo Marauhn eds., 2d ed. 2013).
[34] On this rationale of awards in respect of non-pecuniary damage *see* MUNICH RE, COMPENSATION FOR PAIN AND SUFFERING 14 (2012); Article 10:301 of the Principles of European Tort Law, *supra* note 18, with commentary by WV Horton Rogers at 171 et seq.
[35] For similar considerations relating to the rationale of awards in respect of non-pecuniary damage in a tort context *see* Bundesgerichtshof VI ZR 201/91 (German Federal Ct. of Justice, BGHZ 120, 1, October 13, 1992).
[36] *Gridin v. Russia*, App. No. 4171/04, (Eur. Ct. H.R. June 1, 2006), para. 20. *Firstov v. Russia,* App. No. 42119/04, (Eur. Ct. H.R. February 20, 2014), para. 49 (holding that the "applicant cannot be required to furnish any proof of the non-pecuniary damage he has sustained").
[37] *Apicella v. Italy*, App. No. 64890/01, (Eur. Ct. H.R. March 29, 2006), para. 93 ("strong but rebuttable presumption that excessively long proceedings will occasion non-pecuniary damage").
[38] *See Peck v. United Kingdom*, App. No. 44647/98, (Eur. Ct. H.R. January 28, 2013), para. 118 (referring to "emotional distress").
[39] BYDLINSKI, *supra* note 2, para. 190,

Electronic copy available at: https://ssrn.com/abstract=2631404

applicant "is invited to specify a sum which in their view would be equitable" as a compensation for non-pecuniary damage,[40] the Court usually does not require the applicant to further describe, specify, or quantify his/her damage.

When the Court awards financial satisfaction, it is the respondent state's international legal obligation to pay the sum within a time-limit set out in the Court's judgment (usually, three months from the date on which the judgment becomes final and binding).[41] Since 2001 the sum is normally specified in euros.

Art. 41 does not require the Court to award "just satisfaction" in the form of money. In many cases in which a victim suffered non-pecuniary damage, the Court merely finds and states a human rights' violation. It could be said that such a declaration in itself also constitutes some kind of "satisfaction" for any non-pecuniary damage suffered.[42] Besides these two types of awards – merely declaring the violation, or (additionally) awarding money – the Court has so far not developed another kind of specific response to non-pecuniary damage. For example, it rejected a claim – made under the head of non-pecuniary damage – that the "Government be instructed to disseminate the Court's judgment in the instant case to all the law-enforcement authorities, highlighting the right guaranteed by Article 9 of the Convention".[43] However, the recent practice of requesting the noncompliant State party to take individual or general measures of course *also* responds to non-pecuniary damage.[44]

## 2.      Legal Requirements for Art. 41-Awards

Six requirements must be met before the Court may award "just satisfaction" under Art. 41.

---

[40] Practice Directions (*supra* note 8), para. 15.

[41] Practice Directions (*supra* note 8), paras. 23–25.

[42] *See* on the purely "declaratory" awards in cases where non-pecuniary damage has occurred ICHIM, *supra* note 3, 135–41. *See also* Mónika Józon, *Satisfaction by Finding a Violation, in* TORT LAW IN THE JURISPRUDENCE OF THE EUROPEAN COURT OF HUMAN RIGHTS 741-70 (Attila Fenyves, Ernst Karner, Helmut Koziol & Elisabeth Steiner eds., 2011).

[43] *Begheluri and Others v. Georgia,* App. No. 28490/02, (Eur. Ct. H.R. October 7, 2014), paras. 183–8.

[44] In exceptional cases, the Court has ordered individualized measures concerning the implementation of the judgment, *e.g.* it orders the applicant's release from unlawful detention (*see Assanidze v. Georgia,* App. No. 71503/01, April 8, 2004). Second, the Court may have recourse to the "pilot-judgment procedure" and order general measures to be taken by the respondent state in situations of systemic malfunctioning of state institutions, *see Broniowski v. Poland*, App. No. 31443/96, April 22, 2004, para. 188 ff. On these extensions *see* ANNE PETERS & TILMAN ALTWICKER, EUROPÄISCHE MENSCHENRECHTSKONVENTION 288-91 (2d ed. 2012).

Electronic copy available at: https://ssrn.com/abstract=2631404

(1) The Court must have determined that a right contained in the Convention or a Protocol was violated. In cases of inadmissibility or when the application is struck out of the list, just satisfaction cannot be awarded.[45]

(2) The domestic law of the involved state must not allow for a full "reparation" to be made for the human rights violation (see the wording of Art. 41). This requirement is a manifestation of the principle of subsidiarity which governs the Court's action, also when responding to non-pecuniary damage. It has so far not been further elaborated in the case-law.

(3) Under the Rules of the Court, "[a]n applicant who wishes to obtain an award of just satisfaction under Article 41 of the Convention in the event of the Court finding a violation of his or her Convention rights must make a specific claim to that effect" (Rule 60(1)).[46] In the absence of a specific claim for just satisfaction for non-pecuniary damage (within the appropriate time), the Court usually refuses to issue an award *ex officio*.[47] Only in exceptional cases, the Court has granted just satisfaction even in the absence of a specific claim, especially when a right with an absolute character (Art. 3, prohibition of torture) was concerned.[48]

(4) There must be a causal link between the human rights violation and the non-pecuniary damage.[49] No monetary satisfaction will be granted if non-pecuniary damage for which satisfaction is sought is unrelated to the violation of the Convention.[50] The Court often uses the standard formulation that "it accepts that the applicant must have suffered non-pecuniary damage *as a result of the violations found*."[51] For example, if someone imprisoned under circumstances constituting

---

[45] *Mirosław Garlicki v. Poland,* App. No. 36921/07 (Eur. Ct. H.R. June 14, 2011), para. 154.

[46] Rule 60(1) of the Rules of Court, *at* http://www.echr.coe.int/Documents/Rules_Court_ENG.pdf (entry into force: 1 July 2014).

[47] *Giniewski v. France,* App. No. 64016/00 (Eur. Ct. H.R. January 31, 2006), paras. 59–60: "According to its settled case-law the Court does not make any award by way of just satisfaction where quantified claims and the relevant documentation have not been submitted within the time-limit fixed for that purpose by Rule 60 § 1 of the Rules of Court. In these circumstances, the Court considers that the applicant has failed to comply with his obligations under Rule 60. As no valid claim for just satisfaction has been submitted, the Court considers that no award should be made in this respect."

[48] *Borodin v. Russia*, App. No. 41867/04 (Eur. Ct. H.R. November 6, 2014), para. 166. For a critique of this approach by the Court *see* ICHIM, *supra* note 3, 123 (violation of the principle of *ne ultra petita*).

[49] *Shesti Mai Engineering OOD and Others v. Bulgaria,* App. No. 17854/04 (Eur. Ct. H.R. September 20, 2011) para. 114. On causality in the ECHR context *see* the detailed account by BYDLINSKI, *supra* note 2, 29, 72–92.

[50] Practice Directions (*supra* note 8), paras. 7–8.

[51] *Turek v. Slovakia,* App. No. 57986/00 (Eur. Ct. H.R. February 14, 2006), para. 121 [emphasis added].

Electronic copy available at: https://ssrn.com/abstract=2631404

inhuman or degrading treatment dies because of a brain anoerism, non-pecuniary damage cannot be claimed for an Art. 2-violation (right to life), but potentially only for an Art. 3-violation (inhuman or degrading treatment).

(5) The award of non-pecuniary damage must be "necessary" (Art. 41). The necessity-requirement makes clear that there is no *right* to non-pecuniary damage under the Convention. In the terms of the Court's Practice Directions, "the award of non-pecuniary damage is not an automatic consequence of a finding … that there has been a violation of a right."[52]

### 3. The "Injured Party"

Under Art. 41, the person potentially receiving just satisfaction is the "injured party". This is a procedural notion. Generally speaking, the Court may not award just satisfaction to a third person who is not formally a party to the proceedings. The term "injured party" is synonymous with that of the "victim". Being a "victim" is normally a procedural requirement for bringing an application; victims have standing (*locus standi*) in proceedings (Art. 34). Both concepts have been tied together even stronger by the entry into force of Protocol No. 14 which established the requirement of a "significant disadvantage" as an additional admissibility condition.[53] This means that (a sufficient level of) harm to a protected legal interest is relevant already at the admissibility stage. Its absence will lead to "incompatibility *ratione personae*" (Art. 35(3) (b)).

The notion of the "victim" (or, interchangeably, "injured party") is central for just satisfaction awards. It is unproblematic in cases of natural persons. Even minors and persons lacking legal capacity can have the status of an "injured party". They may choose to be represented before the Court by a guardian (although this is not mandatory).[54] Beyond victims/injured parties, the Court has extended *locus standi* to other persons in two situations: First, when the applicant dies during the proceedings, the Court allows the heirs, or even a third party, to pursue the application, provided that they show a "legitimate interest".[55] Second, the Court accepts applications by "indirect victims": If the "injured party"' (i.e. the person whose treatment by the state

---

[52] Practice Directions (*supra* note 8), para. 1.
[53] ICHIM, *supra* note 3, at 70–1.
[54] *Zehentner v. Austria*, App. No. 20082/02 (Eur. Ct. H.R. July 16, 2009), para. 39.
[55] *Janus v. Poland*, App. No. 8713/03 (Eur. Ct. H.R. January 21, 2009), para. 26; *Malhous v. Czech Republic,* App. No. 33071/96 (Eur. Ct. H.R. December 13, 2000).

Electronic copy available at: https://ssrn.com/abstract=2631404

gave rise to the dispute before the Court) died *before* the application was lodged, next-to-kin relatives may introduce an application concerning the death or disappearance of the "injured party".[56] In the latter two cases, the Court issues its just satisfaction-award not to the "injured party", but to the party who was allowed to pursue the application.

The Court has awarded just satisfaction for non-pecuniary damage to legal persons, too.[57] Certainly, the legal person itself cannot feel "anxiety" or "distress" which trigger such awards. But it arguably has an "individual substratum".[58] On that assumption, what matters is that non-pecuniary damage has been inflicted on the natural persons behind or mediated by the legal entity.[59] The Court has itself justified such awards by pointing to the "company's reputation, uncertainty in decision-planning, disruption in the management of the company (for which there is no precise method of calculating the consequences) and lastly, albeit to a lesser degree, the anxiety and inconvenience caused *to the members of the management team*".[60]

## IV.     Calculating the Award in Respect of Non-Pecuniary Damage

How does the Court arrive at a particular amount awarded in respect of non-pecuniary damage? What are the factors which, according to the Court, play a role in the calculation?

### 1.     The Court's "Equity" Principle

According to the Court, the "*guiding principle is equity*, which above all involves flexibility and an objective consideration of what is just, fair and reasonable in all the circumstances of the case, including not only the position of the applicant but the overall context in which the breach occurred. Its non-pecuniary awards serve to give recognition to the fact that moral damage occurred as a result of a breach of a fundamental human right and *reflect in the broadest of terms the severity of the*

---

[56] *Varnava and others v. Turkey*, *supra* note 28, para. 111. On the notion of "indirect victim" *see* Tamar Feldman, *Indirect Victims, Direct Injury: Recognising Relatives as Victims under the European Human Rights System*, 1 EUROPEAN HUMAN RIGHTS LAW REVIEW 50 (2009).
[57] *Comingersoll S.A. v. Portugal*, App. No. 35382/97 (Eur. Ct. H.R. April 6, 2000).
[58] *See* Marius Emberland, *Compensating Companies for Non-Pecuniary Damage: Comingersoll S.A. v Portugal and the Ambivalent Expansion of the ECHR Scope*, 74 BRITISH YRBK OF INT'L LAW 429-30 (2003).
[59] EMBERLAND, *supra* note 58, at 429 (for references).
[60] *Comingersoll S.A. v. Portugal*, *supra* note 57, para. 35; *Microintelect OOD v. Bulgaria*, App. No. 34129/03, (Eur. Ct. H.R. March 4, 2014), para. 59 (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=2631404

*damage*".[61] According to the Court, the award in respect of non-pecuniary damage "involves flexibility and an objective consideration of what is just, fair and reasonable in all the circumstances of the case".[62]

The Court's Practice Directions put it as follows: "Furthermore, the Court will only award such satisfaction as is considered to be 'just' (*équitable* in the French text) in the circumstances. Consequently, regard will be had to the particular features of each case. The Court may decide that for some heads of alleged prejudice the finding of violation constitutes in itself sufficient just satisfaction, without there being any call to afford financial compensation. It may also find reasons of equity to award less than the value of the actual damage sustained or the costs and expenses actually incurred, or even not to make any award at all. If the existence of such damage is established, and if the Court considers that a monetary award is necessary, it will make an assessment on an equitable basis, having regard to the standards which emerge from its case-law".[63]

How does the Court apply its equity-principle? The starting point is the sum claimed by the applicant which is, however, not binding for the Court.[64] The Court will usually not exceed the claim made by the applicant.[65] Conversely, the claim is often not honored by the Court: For example, in the case *Konstantin Markin v. Russia,* the applicant claimed 400,000 euros in respect of non-pecuniary damage and the Court awarded 3,000 euros.[66] Additionally, the Court may take into account domestic practice on the issue of non-pecuniary damage.[67] Furthermore, multiple violations in a single case seem to lead to increased amounts.[68] "Punitive damages" are not part

---

[61] *Varnava and others v. Turkey*, *supra* note 28, para. 224 (emphases added). *See also Cyprus v. Turkey*, App. No. 25781/94 (Eur. Ct. H.R. May 12, 2014), para. 56. On "equity" in general *see* Francesco Francioni, *Equity in International Law, in* MAX PLANCK ENCYCLOPEDIA OF PUBLIC INTERNATIONAL LAW (2013). For equity in the context of the ECHR *see* ICHIM, *supra* note 3, 43–56.

[62] *Al-Skeini and others v. United Kingdom*, App. No. 55721/07 (Eur. Ct. H.R. July 7, 2011), para. 182.

[63] Practice Directions (*supra* note 8), paras. 1 and 4.

[64] Practice Directions (*supra* note 8), para. 15.

[65] *See Mateescu v. Romania,* App. No. 1944/10 (Eur. Ct. H.R. January 14, 2014), para. 39: Here the Court – referring to the principle of *ne ultra petita* – awarded 1 euro in respect of non-pecuniary damage as claimed by the applicant. *See* KISSLING & KELLIHER*, supra* note 4, 587 (with reference to the case-law).

[66] *Konstantin Markin v. Russia*, App. No. 30078/06 (Eur. Ct. H.R. March 22, 2012), paras. 165–8.

[67] *Comingersoll S.A. v. Portugal*, *supra* note 57, para. 34.

[68] *See M. and C. v. Romania*, App. No. 29032/04 (Eur. Ct. H.R. September 27, 2011), para. 154. *See also* ICHIM, *supra* note 3, 122.

Electronic copy available at: https://ssrn.com/abstract=2631404

of the just satisfaction award under Art. 41.[69] Finally, the Court's assessment of what is "just" in the concrete case is not amenable to proof, as the Court repeatedly held.[70]

The basic consideration of equity is, as already mentioned, that the amount awarded should reflect "in the broadest of terms the severity of the damage".[71] How does the Court assess the degree of "severity" of the damage? The case-law has spelt out three broad elements: the seriousness of the violation, applicant- and overall context-related factors.

### a) Seriousness of the Violation

The first and most important element in the calculation of the award in respect of non-pecuniary damage is the seriousness of the violation.[72] According to the literature, the seriousness of the violation depends on its intensity, on the (particularly) serious consequences of the violation, and on its duration.[73]

The intensity of the violation relates to the importance of the violated protected legal interest. Not all legal interests protected in the Convention are of identical importance. For example, a violation concerning the protected legal interest of "procedural justice" is – at least prima facie – of less intensity compared to that relating to the protected legal interest of "life, physical and mental integrity". Differences in the level of intensity can be explained by an implicit hierarchy of Convention rights, i.e. by ordering the rights according to their relative importance. The Convention itself does not explicitly establish such a hierarchy. However, the order of the rights in the Convention, starting with the right to life (Art. 2) and the prohibition of torture (Art. 3), may suggest their importance. In fact, the Court itself

---

[69] Practice Directions (*supra* note 8), para. 9 ("The Court has …, until now, considered it inappropriate to accept claims for damages with labels such as 'punitive', 'aggravated' or 'exemplary'").

[70] *Korchagin v. Russia*, App. No. 19798/04 (Eur. Ct. H.R. June 1, 2006), para. 25: "The Court observes that non-pecuniary damage is the applicant's subjective measure of the distress he had endured because of a violation of his rights and, by its nature, is not amenable to proof. Furthermore, the applicant cannot be blamed for the authorities' failure to update him on the progress of the enforcement proceedings. The Court accepts that he has suffered distress and frustration because of the State authorities' failure to enforce the judgment in his favor within a reasonable time. Making its assessment on an equitable basis and taking into account the nature of the award as compensation for the unlawful criminal prosecution, the Court awards the applicant EUR 1,200 in respect of non-pecuniary damage, plus any tax that may be chargeable on that amount."

[71] *Al-Jedda v. UK*, App. No. 27021/08 (Eur. Ct. H.R. July 7, 2011), para. 114; *Al-Skeini v. UK*, App. No. 55721/07 (Eur. Ct. H.R. July 7, 2011), para. 182.

[72] *See* GERHARD DANNEMANN, SCHADENSERSATZ BEI VERLETZUNG DER EUROPÄISCHEN MENSCHENRECHTSKONVENTION: EINE RECHTSVERGLEICHENDE UNTERSUCHUNG ZUR HAFTUNG NACH ART. 50 EMRK 398 (1993).

[73] DÖRR, *supra* note 33, 2174.

Electronic copy available at: https://ssrn.com/abstract=2631404

has referred to both Art. 2 and Art. 3 as the "most fundamental provisions" in the Convention and as "enshrining one of the basic values of the democratic societies making up the Council of Europe".[74] Any violation of these rights will likely be considered as "serious". Of course, one should note the limits of this argument: It can hardly be maintained that the prohibition of discrimination (Art. 14), although mentioned last in the section on rights and freedoms, is the least important of the Convention rights. Furthermore, the fact that some rights have been made non-derogable even in times of a national emergency (Art. 15), or do not allow for any exception, such as the prohibition of torture (Art. 3) and the prohibition of slavery or servitude (Art. 4(1)),[75] indicates that the authors of the Convention considered them to be particularly important.

In addition, the consequences of the violation are itself a factor contributing to its seriousness. The Court uses several formulations to qualify the consequences as particularly "serious", i.e. indicating exceptional harm caused by the violation.[76] For example, the Court may state that the applicant must have sustained "significant non-pecuniary damage",[77] or that the applicant "must have suffered considerably"[78] or "suffered serious pain".[79] Lastly, the duration of the violation has a bearing on its seriousness.[80] Examples for such extended, and thus serious, violations are the extended unlawful deprivation of liberty,[81] or extended delays in criminal proceedings in a rape case.[82] However, obviously not all serious violations are of extended duration.

## b)     Applicant-Related Factors

Second, the Court takes the "position of the applicant" into account when calculating the amount of just satisfaction for non-pecuniary damage.[83] What does the Court mean by this? In its jurisprudence, it has e.g. relied on the following applicant-related

---

[74] *Al-Saadoon and Mufdhi v. UK,* App. No. 61498/08 (Eur. Ct. H.R. March 2, 2010), para. 118.

[75] *See, e.g., Mocanu and others v. Romania,* App. No. 56489/00 (Eur. Ct. H.R. September 17, 2014), para. 315.

[76] *See* KISSLING & KELLIHER, *supra* note 4, 629.

[77] *Mocanu and Others v. Romania, supra* note 75, para. 371.

[78] *Dimitrov and Others v. Bulgaria,* App. No. 77938/11 (Eur. Ct. H.R. July 1, 2014), para. 174 (concerning violations of Art. 2 and Art. 3).

[79] *Dimitrov and Others v. Bulgaria, supra* note 78, para. 109 (concerning a violation of Art. 2).

[80] *See* DÖRR, *supra* note 33, 2174.

[81] *Storck v. Germany,* App. No. 61603/00 (Eur. Ct. H.R. June 16, 2005).

[82] *N.D. v. Slovenia,* App. No. 16605/09 (Eur. Ct. H.R. January 15, 2015).

[83] *Al-Skeini and others v. UK,* App. No. 55721/07 (Eur. Ct. H.R. July 7, 2011), para. 182 (standard formulation).

Electronic copy available at: https://ssrn.com/abstract=2631404

factors: the age of the applicant,[84] and the applicant's "important judicial status" (as an acting or retired judge).[85] Furthermore, the Court takes "contributory negligence" by the applicant into account and may reduce the amount of non-pecuniary damage.[86] Additionally, the moral conduct of the applicant matters. From a doctrinal point of view, it has been suggested that the moral conduct of the applicant should be taken into account by the Court for calculating the amount, but that it should not play a role when assessing whether or not the applicant is entitled to just satisfaction in the first place. The latter determination should follow "objective" criteria (such as the seriousness of the violation), unrelated to the applicant's conduct.[87]

### c)    Overall Context-Related Factor

Finally, the amount awarded in respect of non-pecuniary damage depends, according to the statements of the Court, on "the overall context in which the breach occurred"[88], i.e. the "local economic circumstances".[89] The local economic circumstances can be captured by the respondent state. Respondent states have different price levels, which the award in respect of non-pecuniary damage accounts for.

At first sight this is not without problems. Why should torture in Germany pay more than torture in Bulgaria? It has been demanded that the Court should award similar sums in these cases, irrespective of the victims' country of residence.[90] The argument is that identical sums are required by the principle of equal treatment which pervades human rights law. Also, the individual victim might move to a country with a

---

[84] *Kostovska v. the former Yugoslav Republic of Macedonia*, App. No. 44353/02 (Eur. Ct. H.R. June 15, 2006), para. 60. *See also Z. and others v. UK,* App. No. 29392/95 (Eur. Ct. H.R. May 10, 2001), para. 130 ("The children in this case suffered very serious abuse and neglect over a period of more than four years. ... The description of the conditions which they endured and the traumatic effects which this had on the children leave the Court with no doubt that a substantial award to reflect their pain and suffering is appropriate"). *See also Okkali v. Turkey*, App. No. 52067/99 (Eur. Ct. H.R. October 17, 2006), para. 82.

[85] *Zubko and Others v. Ukraine,* App. Nos. 3955/04 5622/04 8538/04 11418/04 (Eur. Ct. H.R. April 26, 2006), para. 74.

[86] Practice Directions (*supra* note 8), para. 2.

[87] ICHIM, *supra* note 3, 124 (referring to C. Tomuschat).

[88] *Al-Skeini and others v. UK, supra* note 62, para. 182 (standard formulation).

[89] *Basarba OOD v. Bulgaria*, App. No. 77660/01 (Eur. Ct. H.R. January 20, 2011), para. 26. Practice Directions (*supra* note 8), para. 2.

[90] Iain Cameron, *Damages for Violations of ECHR Rights: The Swedish Example, in* SWEDISH STUDIES IN EUROPEAN LAW VOLUME I 121 (Nils Wahl & Per Cramér eds., 2006): "There is state responsibility for this violation and as regards the measures of damages, the ECtHR, the guardian of pan-European values, naturally could not, and should not, say that a life in, eg, Turkey is worth less than a life in, eg, Sweden."

Electronic copy available at: https://ssrn.com/abstract=2631404

higher price level after the Court's decision. In that case the purchasing power of the sum of money awarded decreases unfairly.[91] Both arguments should be rejected. First, the principle of equality does not demand identical, but appropriate treatment *(suum quique)*. At this point the rationale for awards in respect of non-pecuniary damage must be taken into account. The purpose of awards in respect of non-pecuniary damage is to (although imperfectly) compensate the individual for immaterial harm suffered *taking into account the specificities of his or her situation.* This necessarily context-specific determination of the award is a normative argument against identical treatment of individuals (irrespective of, e.g., their country of residence).

From this perspective, it is fair that victims in Bulgaria receive a lower sum than victims in Germany. The constellation that a person might move from a country with a lower price level to a country with a higher price level is unforeseeable. We assume that this scenario is rare. Determining the sums with regard to the local economic circumstances in the current place of residence (independently of potential moves) satisfies the concern for legal clarity, and again, guarantees equal treatment of victims currently residing in the same state. Extraordinary cases and speculations about the future place of residence should not govern the scheme of calculating just satisfaction.

Second, the policy of the Court properly takes the burden on the state into account. As long as there is no pan-European fund from which the just satisfaction is paid (in the style of the reparation fund at the International Criminal Court, Art. 75 ICC-Statute), the economic capacities of the respondent state should indeed play a role. Under the Convention's general clause on jurisdiction (Art. 1), territory and location matter, both for the Convention state's primary obligation of conduct and for its secondary obligation to remedy and repair. The just satisfaction for non-pecuniary damage concerns the relationship between the victim and the respondent state. It is this relationship which matters for the calculation of the award in respect of non-pecuniary damage. Based on these considerations, the Court's practice of differentiated sums seems justified.

---

[91] Ichim, *supra* note 3, 160.

21

Electronic copy available at: https://ssrn.com/abstract=2631404

### 2.    Limited Standardization

Precedent standardizes the awards in respect of non-pecuniary damage to a limited extent.[92] Although Anglo-American *stare decisis* does not govern the jurisprudence of the Court, the ECtHR takes its prior case-law into consideration when calculating the amount.[93] The Court has started to set up tables or scales on past awards in respect of non-pecuniary damage, stating average sums, grouped on the basis of respondent states and violated rights.[94] Good reasons militate in favor of making the tables public. For example, publication would strengthen institutional legitimacy by increasing the public's trust in the Court's jurisprudence, would forestall excessive demands, would create legal certainty, and would enable a more constructive public and academic debate on the topic of just satisfaction-awards.[95] Nevertheless, the Court has not yet published any table. Still, the apparent reliance of the Court on such (secret) tables is a step ensuring the consistency of its just-satisfaction awards.

## V.    Data

### 1.    Sample Selection

Data is drawn from the online HUDOC database, which provides access to the case-law of the ECtHR.[96] We created an initial database by selecting *all* judgments on the merits which were decided by the Court in 2006. In cases in which the Court deferred the decision on just satisfaction,[97] we re-joined the two judgments (the one on the merits and the later judgment on just satisfaction). We selected *judgments* (thereby excluding *decisions* on admissibility) because only judgments may contain an award of just satisfaction. The year 2006 was chosen for two reasons. First, the award relating to non-pecuniary damage is denoted in euros (as opposed to awards up to the year 2001). Second, we took into account that the phase of the supervision of the execution of judgments by the Committee of Ministers can take up to ten years. Choosing the year 2006 has the advantage that an analysis of compliance with

---

[92] *See also* KISSLING & KELLIHER, *supra* note 4, 623.
[93] *See Kakamoukas and Others v. Greece*, App. No. 38311/02 (Eur. Ct. H.R. February 15, 2008), para. 45. See also Practice Directions (*supra* note 8), para. 14 (The Court will make an "assessment on an equitable basis, having regard to the standards which emerge from its case-law").
[94] *See* ICHIM, *supra* note 3, 121 (with further references); Nicola Wenzel, *Artikel 41, in* EMRK: KONVENTION ZUM SCHUTZ DER MENSCHENRECHTE UND GRUNDFREIHEITEN 573, 581 (Ulrich Karpenstein & Franz C. Mayer eds., 2012).
[95] For further reasons *see* ICHIM, *supra* note 3, 160–3.
[96] *At* http://hudoc.echr.coe.int/.
[97] When the question is not ready for decision, Rule 75(1) of the Rules of Court.

Electronic copy available at: https://ssrn.com/abstract=2631404

exactly these judgments can be undertaken in a subsequent study. Cases which have been struck out of the Court's list and cases in which the Court did not find a violation of a Convention right were not selected for the initial database. This initial database contains 1,425 cases.

We then applied a number of restrictions to arrive at our working sample.[98] First, we excluded cases where no claim for just satisfaction was made. Second, cases were dropped if the amount awarded in respect of non-pecuniary damage could not be calculated accurately. Two types of cases had to be dropped because of the latter restriction: (a) cases where the Court awarded a "global sum" in respect of non-pecuniary and pecuniary damage *and* the non-pecuniary and pecuniary parts of this "global sum" could not be disaggregated,[99] and (b) cases where the amount awarded in respect of non-pecuniary damage could not be allocated to the "injured party". An important subgroup of (b) relates to cases where the Court found both a material and a procedural violation of Art. 2 (right to life). In these cases, the award made in respect of non-pecuniary damage pertaining to the "injured party" (concerning his or her death) could not be disentangled from that related to the procedural violation of the "indirect victim(s)", e.g. the relatives complaining about the lack of an effective investigation by the state into the circumstances of the injured party's death.

Third, we excluded all cases with more than one holding on a violation. This allowed us to assess the association between the amount of just satisfaction awarded and the violation of one *particular* protected legal interest (such as "physical liberty"). Fourth, we excluded all cases in which the Court rejected the claim for an award of non-pecuniary damage. Finally, we excluded the cases belonging to the protected legal interests of "non-discrimination" and "ECHR procedure", because the number of cases in these two categories was too small (only one case in each category) for a meaningful statistical analysis.[100] Our final sample includes 543 cases.

---

[98] In addition to the variables for the empirical analysis (see Section V.3.), the following binary variables were coded for the purpose of sample selection/restriction: (1) a variable indicating whether an award in respect of non-pecuniary was made; (2) a variable indicating whether the "injured party" passed away/disappeared due to the conduct attributable to the state; (3) a variable indicating whether the Court's holding contained a finding on a violation of a substantive right in its procedural dimension.

[99] On the legal problems involved *see* KISSLING & KELLIHER, *supra* note 4, 585–6.

[100] The protected legal interest of "ECHR procedure" relates to the right to an effective application before the ECtHR. The Court locates this individual procedural right in Art. 34, *see Gisayev v. Russia*, App. No. 14811/04 (Eur. Ct. H.R. January 20, 2011), para. 165.

Electronic copy available at: https://ssrn.com/abstract=2631404

Importantly, our results apply only to the selected sample as defined by the restrictions above. Moreover, because the analysis is limited to ECtHR-cases that were decided on the merits in 2006, our conclusions cannot be generalized to other courts and to years other than 2006.

## 2. *Unit of Analysis*

An empirical analysis of the award in respect of non-pecuniary damage by the Court can be potentially carried out on three levels: *case* level, *application* level and *individual victim* level. We chose the victim level.

In a case-based analysis, the unit of observation is the case itself. By "case" we mean the collection of facts on a particular series of events and relevant legal material, leading to a formal legal decision by the Court. A case may contain one application or more applications (if joined by the Court according to Rule 42 of the Rules of Court). A case may involve more than one judgment if, e.g., the Court decides separately on the admissibility and merits (Art. 29(1)(2) ECHR), or if the Court decides separately on the merits and just satisfaction (according to Rule 75(1) of the Rules of Court).[101] In our study, we have 543 cases.

An application-based analysis focuses on the actual application, as identified by the application number given by the Court's registry.[102] In our dataset, several cases contain more than one application: the 543 cases correspond to 587 applications. The number of applications exceeds the number of cases because the Court has the possibility to join several applications in one case if they are of a similar nature.[103] Despite the fact that "similar" applications are joined in one case, some of the variables of interest in our study (e.g. the amount awarded in respect of non-pecuniary damage) may differ within one case by application. For example, the Court decided to join several applications to form the case *Kehaya & others v. Bulgaria* on the deprivation of property.[104] While the Court found a violation of Art. 1 Prot. No. 1

---

[101] A case may involve one or more decisions of a formal legal type, i.e. admissibility decisions and judgments. A case may be resolved by an *admissibility decision* if the application is declared inadmissible according to Art. 27 or Art. 28 ECHR. A case is resolved by a *judgment* if the Court, e.g., decides on the admissibility and the merits of the case together (Art. 29 ECHR). For our analysis we only selected judgments.
[102] *At* http://www.echr.coe.int/pages/home.aspx?p=court/howitworks&c= (visited September 19, 2014).
[103] Rule 42 of the Rules of Court.
[104] *Kehaya & others v. Bulgaria*, App. No. 47797/99 & 6898/01 (Eur. Ct. H.R. January 12, 2006), para. 8.

Electronic copy available at: https://ssrn.com/abstract=2631404

(right to property) in all applications, it awarded different amounts in respect of non-pecuniary damage to the different applicants.[105]

An individual victim level analysis (as chosen in this paper) focuses on the individual victim himself/herself. "Victim" is a technical term relating to the application procedure before the Court (Art. 34 ECHR). In order to be considered a victim, an individual applicant must show that he or she is directly affected by a measure which arguably led to a violation and which is allegedly attributable to the respondent state.[106] He or she must also show that the violation has not yet been redressed by the state.[107] In our dataset, the 543 cases correspond to 929 individual victims. The number of individual victims may exceed the number of cases and applications for two reasons. First, as outlined above, the Court itself joins applications, thereby grouping individual victims. Second, the victims themselves may file a complaint jointly with the Court. It is important to re-emphasize that some of the variables of interest in our study may differ within a case and in fact within one single application filed by several victims. For example, in the case *Güzel Şahin and others v. Turkey*,[108] only one application was introduced by five individuals who were awarded different sums in respect of non-pecuniary damage although each victim suffered the same rights' violation.

We choose the individual victim level for our analysis for two reasons. First, because the Court itself takes an individualized approach to Convention rights and considers the impact of an act attributable to a state party on the individual, the unit of analysis needs to be the individual victim. Second, as the examples above demonstrate, within-case and within-application variation renders both a case-based and an application-based analysis problematic. One could restrict the analysis to "clear cases", i.e. those without any within-variation. However, this approach would introduce selection-bias and would unnecessarily reduce the sample size.

### 3.    *Variables*

For the empirical analysis, we coded the amount awarded in respect of non-pecuniary damage and variables that correspond to the elements of the Court's

---

[105] *Kehaya & others v. Bulgaria* (just satisfaction), App. No.47797/99 & 6898/01 (Eur. Ct. H.R. June 14, 2007), para. 29.

[106]  *Oleksy v. Poland,* App. No. 1379/06 (Eur. Ct. H.R. July 16, 2009); *Burden v. UK*, App. No. 13378/05 (Eur. Ct. H.R. April 29, 2008), para. 33.

[107] *Sakhnovskiy v. Russia*, App. No. 21272/03 (Eur. Ct. H.R. November 2, 2010), para. 67.

[108] *Güzel Şahin and others v. Turkey*, App. No. 68263/01 (Eur. Ct. H.R. December 21, 2006).

Electronic copy available at: https://ssrn.com/abstract=2631404

equity-principle (described in Section IV.1). Additional variables were coded to complement the analysis of the equity-principle.

### a)      Amount Awarded in Respect of Non-Pecuniary Damage

As mentioned above, we carry out the empirical analysis at the individual victim level. Therefore, it was important to code the amount awarded in respect of non-pecuniary damage for *each* individual victim in our dataset. Clearly, this was not problematic in cases with *one* individual victim. In cases with *more than one* individual victim the coding of the award at the individual victim level was not problematic either if the Court specified the amount of non-pecuniary damage awarded for *each* individual victim *separately*. However, the amount of non-pecuniary damage awarded was not always specified separately for each individual victim. In such cases we had to adjust the amount awarded in respect of non-pecuniary damage. There were two types of cases involving more than one individual victim which required adjustment. First, in some cases with more than one individual victim, the Court only specified a *joint* amount for all the individual victims rather than *separate* amounts for each victim individually. In these cases we had to divide this *joint* amount by the number of individual victims in order to arrive at the individual level. Second, in some other cases the Court specified an amount of non-pecuniary damage without stating explicitly whether the amount was awarded *jointly* or *separately* to the victims. In such cases, the Press Release issued by the Registry of the Court needed to be consulted in order to find out how much was awarded to whom.

### b)      Seriousness of the Violation

The seriousness of the violation encompasses three factors, as explained above: "intensity of the violation", "(particularly) serious consequences of the violation", and the "duration of the violation".

To capture the intensity of the violation two variables were coded: The Court's holdings on violations of a Convention right,[109] and health topics. We chose the protected legal interest-level (as opposed to, e.g., an article-based approach) in order to ensure enough observations for a meaningful empirical analysis. We allocated the holdings to eight protected legal interests: "life, physical and mental integrity",

---

[109] There may be several different holdings regarding one article. For example, the holding is different if Article 5(1) or Article 5(3) is violated.

Electronic copy available at: https://ssrn.com/abstract=2631404

"physical liberty", "procedural justice", "private and family life", "personal and political liberty", "property", "non-discrimination" and "ECHR procedure". These protected legal interests and the corresponding articles of the ECHR are shown in Table 4. These protected legal interests are assumed to capture different levels of violation-intensity: For example, we assume that violations relating to "life, physical and mental integrity" are the most intense type of violation, because they encompass, e.g., the right to life (Art. 2) and prohibition of torture (Art. 3). As mentioned above, the cases belonging to the protected legal interests "non-discrimination" and "ECHR procedure" were excluded from the analysis due to limited case numbers.

For a comprehensive coverage of the protected legal interest concerning "life, physical and mental integrity", further analysis of the data was required. We identified all "health cases", i.e. those cases in which the victim's physical or mental integrity were negatively affected by conduct attributable to the state. For example, a health case arises if a person is tortured in police custody or is treated inadequately in a state hospital. The health cases were identified based on 29 health topics (described in Table 2), using the health topics list of the World Health Organization (WHO).[110] However, given the special features of an international (regional) court (which has jurisdiction only for acts and omissions attributable to a state), as well as the particular focus of the ECHR (which does not guarantee a "right to health" in itself); we had to split up the WHO health topic of "violence" into further sub-categories. A first sub-category is that of "execution/killing or creation/maintaining of a life-threatening situation by the state", the second is "torture or inhuman/degrading treatment while in police custody", and the third sub-category is "violation of bodily integrity".

In order to capture the (particularly) serious consequences of the violation of the Convention, a binary variable was coded based on the explicit wording of the Court's judgment. However, the number of cases involving an explicit finding on the seriousness of the violation was very small, less than one percent of the selected sample. The main reason for this low proportion is that we restricted our analysis to cases with one violation, and these contain fewer instances of serious consequences

---

[110] World Health Organization (WHO), *at* http://www.who.int/topics/en/.

Electronic copy available at: https://ssrn.com/abstract=2631404

than cases with multiple violations. Because of the small case number, we finally did not include this variable in the analysis.

We did not code "duration of the violation" because it is not always stated in the judgment and because not all serious violations are of extended duration.

### c) Applicant-related Factors

We coded a number of applicant-related factors not included in the equity-principle: victim type, sex, and various variables indicating the nationality of the applicant. We coded victim type because one legal person may comprise numerous natural persons which in turn may lead to higher awards in respect of non-pecuniary damage. Sex and variables indicating the nationality of the applicant were coded mainly in order to test the assumption that these factors are *not* associated with the award made in respect of non-pecuniary damage. For the empirical analysis, a binary variable was generated, based on the nationality of the individual, equal to one if the individual was a national of the respondent state and zero otherwise. In the ten cases in which the nationality was missing in the data, we used the following procedure: (a) nationality was replaced by the victim's place of birth, and (b) if the place of birth was missing as well, then the victim's current place of residence was used.

Applicant-related factors included in the equity-principle, namely the "age of the applicant", "important judicial status", and "conduct", could not be analyzed for different reasons. We excluded "age" due to the large number of missings: A valid birth date could not be identified for around 17 percent of the selected sample and subsequently it was impossible to calculate the age of the applicant at the time of the violation or at the time of the Court's decision for around one fifth of the sample. Our dataset only contained one case with "important judicial status", clearly not enough for an empirical analysis. The applicant's "conduct" was not coded because, even if reported, this applicant-related factor requires substantial qualitative analysis which is subject to coding errors.

### d) Overall Context-Related Factor

The respondent state was coded as an overall context-related factor. For the empirical analysis, we allocated the respondent states to three groups. First, we distinguished between "old" and "new" member states by year of accession to the

Electronic copy available at: https://ssrn.com/abstract=2631404

Council of Europe. "Old" members of the Council of Europe are those with an accession date between 1949 and 1989, "new" members acceded between 1990 and 2003 (after 2003, no new accessions occurred). The distinction between "old" and "new" members corresponds to the differences in price levels across member states. Old member states had a higher price level in 2006 compared to the new member states, with the exception of Turkey.[111] This is important because we assume, in line with the equity-principle, that in countries with a lower price level a smaller amount in respect of non-pecuniary damage will be awarded for violations.

Our third group is Turkey. We decided to treat Turkey as a separate group for three reasons. First, and most importantly, Turkey is an outlier in the group of old member states in terms of price level: In 2006, the price level in Turkey was lower than in the other old member states and not consistently higher than that in the new member states. Second, Turkey is an outlier in the group of old member states with regard to respect for rule of law and democracy. Its low scores on indicators measuring rule of law and democracy relative to the other old member states are documented by the World Justice Project (WJP) Rule of Law Index and the Economist Intelligence Unit democracy Index.[112] Third, an exceptionally large number of cases arise from Turkey (18 percent), allowing for separate grouping.

The three groups and the corresponding countries in the full sample are listed in Table 3.[113] The full sample contains 34 countries; 16 and 17 of these countries belong to the old and new member states, respectively.

### e) Court-Related Factor

Finally, we captured one Court-related factor: type of opinion concerning the holding (e.g. unanimous opinion). This Court-related factor is not part of the equity-principle as outlined above. We include it as a control variable in one of our estimated models because we assume that there is an association between the amount awarded in respect of non-pecuniary damage and the "complexity" of the cases, as indicated by

---

[111] For detail on comparative price levels *see at* http://ec.europa.eu/eurostat/tgm/table.do?tab=table&init=1&language=en&pcode=tec00120&plugin=1.
[112] For detail on the WJP Rule of Law Index and on the Economist Intelligence Unit democracy index 2006 *see at* http://worldjusticeproject.org/sites/default/files/files/introduction_key_findings.pdf and http://www.economist.com/media/pdf/DEMOCRACY_TABLE_2007_v3.pdf.
[113] By "full sample" we mean the full selected sample as defined by our sample restrictions (N=929). The "subsample of natural persons" refers to the natural persons within our full sample.

Electronic copy available at: https://ssrn.com/abstract=2631404

the existence of a separate opinion concerning the holding(s). Therefore, four types of opinion were coded: unanimous, concurring, dissenting opinion, and both concurring and dissenting opinions within a case. We then merged these four types of opinion for the empirical analysis to indicate the presence of a separate opinion as follows: unanimous versus at least one concurring and/or dissenting opinion.

The coded variables are described and summarized in Tables 1 and 5, respectively.[114]

## VI. Empirical Model and Estimation Results

### 1. Empirical Model

We use a multiple regression analysis to examine the relationship between the amount awarded in respect of non-pecuniary damage and the three elements of the equity-principle, namely seriousness of the violation, overall context- and applicant-related factors. We define Model 1 (the "equity model"), our benchmark model, as follows:

$$\log(y_i) = \beta_0 + \beta_1 V_{1i} + \beta_2 V_{2i} + \beta_3 V_{3i} + \beta_4 V_{4i} + \beta_5 V_{5i} + \beta_6 S_{1i} + \beta_7 S_{2i} + \beta_8 L_1 + \varepsilon_i, \qquad i = 1,...,n.$$

The dependent variable, $\log(y_i)$, is the natural logarithm of the amount awarded in respect of non-pecuniary damage.[115] The subscript $i$ indexes the individual victims in the selected sample of $n$ victims. A visual inspection of Figure 1 suggests that the distribution of the awards made in respect of non-pecuniary damage in the full selected sample is right-skewed, with a small number of victims awarded high sums in respect of non-pecuniary damage.[116] We use the logarithmic transformation of the amount awarded in respect of non-pecuniary damage in order to mitigate the right-skewedness of the award distribution and because it allows for the interpretation of the parameter estimates in terms of percentage changes.[117]

---

[114] The full list of coded variables is available upon request.
[115] See JEFFREY M. WOOLDRIDGE, INTRODUCTORY ECONOMETRICS: A MODERN APPROACH 191-94 (5 ed. 2013) on logarithmic functional forms.
[116] Note that the distribution on non-pecuniary damage for the subsample of natural persons is right-skewed as well. The figure is available on request.
[117] The logarithmic transformation makes the non-pecuniary damage distribution more normal. The results are available upon request.

Electronic copy available at: https://ssrn.com/abstract=2631404

The key independent variables are the protected legal interests: "life, physical and mental integrity", "physical liberty", "procedural justice", "private and family life", "personal and political liberty" and "property". For the analysis we select the most dominant category, namely "procedural justice", as our reference category and define five dummy variables ($V_{ki}$, $k = 1,...,5$) for each of the remaining categories.

Further explanatory variables in Model 1 are those variables which we assume to play a significant role in the award made in respect of non-pecuniary damage: the grouped respondent states and victim type. In our analysis, we choose the new member states (the most dominant category) as the base category and define two dummy variables ($S_{1i}$ and $S_{2i}$) for Turkey and the old member states. We assume, for reasons outlined above, that a higher amount in respect of non-pecuniary damage is awarded to victims in the old member states and in Turkey, ceteris paribus. We include a dummy variable for the victim type ($L_i$), equal to one for legal persons and zero for natural persons. The inclusion of victim type is due to the fact that one legal person may comprise numerous natural persons, which in turn may influence the amount awarded.

The coefficients to be estimated are the $\beta$s, and $\varepsilon_i$ is an error term. The $\beta$s are estimated by ordinary least squares (OLS). Standard errors are clustered at the case level, because the judges tend to join similar applications into one case. Model 1 is estimated on the full sample.

In additional models (Models 2 and 3), we extend the set of independent variables in Model 1. In Model 2 we account for a court-related factor, namely the presence of a separate opinion, by defining a dummy variable equal to one for unanimous opinions and zero for the presence of a separate opinion (concurring and/or dissenting). Model 2 is estimated on the full sample. In Model 3 we extend the set of independent variables in Model 1 to account for additional applicant-related factors, by including dummy variables for sex (equal to one if female and zero if male) and nationality (equal to one for non-nationals of the respondent state and zero for nationals of the respondent state). We fit Model 3 on the subsample of natural persons. For the subsample analysis we exclude observations with missing information on sex and nationality. The missing values on sex and nationality coincide and amount to less

31

Electronic copy available at: https://ssrn.com/abstract=2631404

than one percent of the subsample of natural persons. Note that we expect that neither sex nor nationality is associated with the amount awarded for non-pecuniary damage. Model 3 is estimated to test the latter assumptions.

## 2. Estimation Results

The OLS estimation results for our three models are reported in Table 6.[118] First, we summarize the results concerning the protected legal interests in Model 1, our "equity model". The coefficient estimates on the five dummy variables for the protected legal interests measure the proportionate difference in awards made in respect of non-pecuniary damage relative to "procedural justice", holding respondent state, and victim type constant. In Model 1, all of the coefficients are statistically significant, with the exception of "property". Victims suffering violations concerning the protected legal interest of "life, physical and mental integrity" are awarded approximately 72% more than victims suffering violations concerning "procedural justice" – which is the highest "premium".[119] Victims suffering violations concerning "private and family life" are also awarded a higher amount in respect of non-pecuniary damage relative to the reference category by around 41%. Victims suffering violations concerning "physical liberty" and "personal and political liberty" are awarded a lower amount in respect of non-pecuniary damage relative to the reference category by approximately 59% and 47%, respectively.

The coefficient estimates of the context- and applicant-related variables in Model 1 are all statistically significant. Victims from Turkey and the remaining old member states are awarded around 39% and 63% more than those from new member states,

---

[118]   As a robustness check, we ran our preferred model (Model 1) as a robust regression. The robust regression confirmed the OLS results. Furthermore, we estimated Model 1 on two alternative, "conservative" samples. First, we estimated Model 1 on a sample where the final decision on the award of the amount granted in respect of non-pecuniary damage was made in 2006 (N=851). Second, we estimated Model 1 on the sample where the protected legal interest of "physical liberty" did not contain the procedural aspects of the right to physical liberty, i.e. Article 5(2)–(5) (N=920). The parameter estimates remained robust in both "conservative" samples. Furthermore, we estimated an alternative version of Model 2, whereby we included a further Court-related variable, a continuous variable indicating the time elapsed between the lodge date and the judgment date (measured in years). The estimated coefficient on this additional control variable was neither economically nor statistically significant and its inclusion did not affect the remaining coefficient estimates. Finally, we fitted Model 3 on the full subsample of natural persons (N=911). The parameter estimates remained robust. The unreported estimation results are available upon request.

[119] Note that we refer to the "approximation" (i.e. $100 \times \hat{\beta}$) when discussing the coefficient estimates and not to the exact percentage (i.e. $100 \times \left[ \exp(\hat{\beta}) - 1 \right]$).

Electronic copy available at: https://ssrn.com/abstract=2631404

respectively, ceteris paribus. Legal persons are awarded approximately 42% more in respect of non-pecuniary damage, relative to natural persons, ceteris paribus.

The estimated coefficients on the protected legal interests, respondent state groups and victim type are robust across Models 1–3. In Model 2, we extended the "equity model" with a variable capturing the presence of a separate opinion. The award in respect of non-pecuniary damage in cases with concurring and/or dissenting opinion is estimated to be lower by around 54% relative to those with a unanimous opinion, holding protected legal interest, respondent state and victim type fixed. In Model 3, we expanded the set of control variables to capture applicant-related characteristics, and ran the OLS regression on the subsample of natural persons. The coefficient estimates on both sex and nationality dummies are statistically not significant. This implies that neither women nor non-nationals of a respondent state are awarded a lower amount in respect of non-pecuniary damage than otherwise comparable men and nationals of the respondent states.

## VII.    Discussion

This Section discusses the estimation results in light of the Court's equity-principle. Our empirical results show that there is a "pattern" in the awards made in respect of non-pecuniary damage by the Court. In the following, we discuss our findings for the protected legal interests and other factors in detail.

### 1.    *Intensity of the Violation*

### a)    Life, Physical and Mental Integrity

The protected legal interest of "life, physical and mental integrity" is covered and shaped by a number of Convention rights: the right to life (Art. 2), the prohibition of torture and inhuman or degrading treatment/punishment (Art. 3), the prohibition of slavery and forced labor (Art. 4), and the abolition of the death penalty (Art. 1 Prot. 6). Violations of bodily or mental health that do not exceed the level of severity required for Art. 3 may be considered under the right to private life (Art. 8), under its head of "physical and psychological integrity of a person".[120] To argue a case under the physical and psychological integrity-head of Art. 8, the actual harm to the victim's

---

[120] *Pretty v. UK,* App. No. 2346/02 (Eur. Ct. H.R. April 29, 2002), para. 61; *Gillberg v. Sweden*, App. No. 41723/06 (Eur. Ct. H.R. April 3, 2012), para. 66.

Electronic copy available at: https://ssrn.com/abstract=2631404

health and well-being must have reached a sufficient level.[121] The cases in our selected sample concerned, e.g., the lack of an independent, adequate or effective investigation into the death of a relative,[122] weekly routine strip-searches of a prison inmate,[123] ill-treatment while in police custody,[124] inadequate conditions of detention,[125] or harm due to environmental pollution.[126]

The protected legal interest of "life, physical and mental integrity" is commonly considered to be of highest importance. It was therefore expected that the highest premium is awarded for harm done to this legal interest. The results confirm our expectation. It should be noted, however, that the cases in the sub-sample of "life, physical and mental integrity" did not involve cases of death or disappearance of victims due to the sample restrictions that we made, thereby excluding some of the most severe cases. Given the assumption that the amount awarded in respect of non-pecuniary damage is higher in these cases, the estimates concerning the protected legal interest of "life, physical and mental integrity" in the present study may be downward biased.

## b)   Private and Family Life

The legal interest of "private and family life" is protected by a number of provisions of the Convention: Art. 8 (right to respect for private and family life), Art. 12 (right to marry), Art. 2 Prot. 1 (right to education, including the rights of parents in education), and Art. 2 Prot. 4 (freedom of movement, choice of residence and freedom to leave the country), Art. 3 Prot. 4 (prohibition of expulsion of nationals), Art. 4 Prot. 4 (prohibition of collective expulsion of aliens). The scope of the right to respect for private life (Art. 8) is very broad, and – according to the Court – "does not lend itself to exhaustive definition".[127] This, in turn, leads to a broad spectrum of constellations in which the Court applies Art. 8. Regarding "private life", our sample contains, e.g.,

---

[121] *Ledyayeva and Others v. Russia,* App. Nos. 53157/99 53247/99 56850/00 53695/00 (Eur. Ct. H.R. October 26, 2006), para. 100.

[122] *Sergey Shevchenko v. Ukraine,* App. No. 32478/02 (Eur. Ct. H.R. April 4, 2006).

[123] *Sylla v. the Netherlands,* App. No. 14683/03 (Eur. Ct. H.R. July 6, 2006).

[124] *Emirhan Yıldız and Others v. Turkey,* App. No, 61898/00 (Eur. Ct. H.R. December 5, 2006).

[125] *Cenbauer v. Croatia,* App. No. 73786/01 (Eur. Ct. H.R. March 9, 2006); *Kaja v. Greece,* App. No. 73786/01 (Eur. Ct. H.R. July 27, 2007).

[126] *Ledyayeva and Others v. Russia, supra* note 121.

[127] *Mubilanzila Mayeka and Kaniki Mitunga v. Belgium,* App. No. 13178/03 (Eur. Ct. H.R. October 12, 2006), para. 83.

Electronic copy available at: https://ssrn.com/abstract=2631404

cases on the search of home and office,[128] interferences with the right to correspondence of a prison inmate,[129] or the dissemination of information concerning the applicant and a photograph of him in a newspaper and in decisions by domestic courts.[130] Regarding "family life", our sample contains, e.g., cases concerning inappropriate efforts by the state to ensure the applicant's access to his child,[131] and the authorities' failure to reunite a father with his daughter.[132] Our sample did not include cases concerning the right to marry (Art. 12), but one case on the right to education (Art. 2 Prot. 1).[133] The latter case concerned the annulment of the results of a candidate who had passed university admission exams.[134] The sample contained one case on the freedom of movement (Art. 2 Prot. 4), in which the authorities refused to issue a passport for travel.[135]

Awards made in respect of non-pecuniary damage in cases concerning the protected legal interest of "private and family life" are considerably high, ranging second after "life, physical and mental integrity". This can be explained by the close connection of this protected legal interest with the fundamental value of human dignity.[136]

### c)    Procedural Justice

The group of protected legal interest of "procedural justice" encompasses a number of Convention rights. The central provision on procedural justice in the Convention is the right to fair trial contained in Art. 6. It is supplemented by procedural guarantees contained in other Convention norms: no punishment without law (Art. 7), the right to an effective remedy (Art. 13), Art. 1 Prot. 7 (procedural safeguards relating to the expulsion of aliens), Art. 2 Prot. 7 (the right of appeal in criminal matters), the right to compensation for wrongful conviction (Art. 3 Prot. 7), and the right not to be tried or

---

[128] *Taner Kılıç v. Turkey,* App. No. 70845/01 (Eur. Ct. H.R. October 24, 2006).

[129] *Kwiek v. Poland,* App. No. 51895/99 (Eur. Ct. H.R. May 30, 2006); *Čiapas v. Lithuania,* App. No. 4902/02 (Eur. Ct. H.R. November 16, 2006); *Fazıl Ahmet Tamer v. Turkey*, App. No. 6289/02 (Eur. Ct. H.R. December 5, 2006).

[130] *Gurgenidze v. Georgia,* App. No. 71678/01 (Eur. Ct. H.R. October 17, 2006).

[131] *Lafargue v. Roumania,* App. No. 37284/02 (July 13, 2006). Similarly, *Hunt v. Ukraine,* App. No. 31111/04 (Eur. Ct. H.R. December 7, 2006).

[132] *Bajrami v. Albania*, App. No. 35853/04 (Eur. Ct. H.R. December 12, 2006).

[133] *Mürsel Eren v. Turkey*, App. No. 60856/00 (February 7, 2006).

[134] *Mürsel Eren v. Turkey*, *supra* note 133.

[135] *Bartik v. Russia*, App. No. 55565/00 (Eur. Ct. H.R. December 21, 2006).

[136] The Court has stated that "the very essence of the Convention is respect for human dignity and human freedom." (*V.C. v. Slovakia*, App. No. 18968/07, (Eur. Ct. H.R. November 8, 2011), para. 105). On the connection between human freedom (understood as autonomy) and human dignity see from an ethical perspective, JAMES GRIFFIN, ON HUMAN RIGHTS 151-58 (2011).

Electronic copy available at: https://ssrn.com/abstract=2631404

punished twice (Art. 4 Prot. 7). The cases in our sample concern, e.g., the length of proceedings (Art. 6(1)),[137] the non-enforcement of a domestic Court judgment (Art. 6(1)),[138] denial of effective access to an impartial tribunal (Art. 6(1)),[139] and the independence of the tribunal (Art. 6(1)).[140]

In our sample, the cases belonging to the protected legal interest "procedural justice" by far outnumbered cases falling under the other protected legal interests (see Table 5). The "procedural justice"-group was thus chosen as the reference group.

It is worth noting that awards made in respect of non-pecuniary damage concerning violations of "procedural justice" are significantly higher than those relating to "personal and political liberty" or "physical liberty". This finding is interesting because it seems counter-intuitive. An important reason for this result may be connected to the fact that many of the cases under "procedural justice" relate to non-enforcement of domestic court judgments on pecuniary matters. If that domestic judgment relates to a pecuniary asset (e.g. recovery of unpaid salary) is not enforced, the case – though formally concerning only "procedural justice" – involves a material aspect, too.[141] The Court takes this material aspect into account when calculating the award in respect of non-pecuniary damage. The award increases proportionate "to the period during which a binding and enforceable judgment remained unenforced".[142] This may account for the high awards in some cases.

Though this cannot be verified, the Court may also have policy reasons: The relatively high amounts of the awards may have to do with the fact that "procedural justice" is an element of the state structure, which means that violations are sometimes indicative of systemic deficits, and the Court (intuitively) uses just satisfaction to incite the respondent state to remedy these systemic problems. In other words, violations of the protected legal interest of "procedural justice" are particularly harmful to the idea of human rights in general because they involve domestic courts on which the (Strasbourg) Court must generally rely as "natural

---

[137] For example, *Kuvikas v. Lithuania,* App. No. 21837/02 (Eur. Ct. H.R. June 27, 2006); *Simaskou v. Greece*, App. No. 37270/02 (Eur. Ct. H.R. March 30, 2006).
[138] *Lisyanskiy v. Ukraine,* App. Nos. 17899/02 9719/02 (Eur. Ct. H.R. April 4, 2006).
[139] *Szwagrun-Baurycza v. Poland*, App. No. 41187/02 (Eur. Ct. H.R. October 24, 2006).
[140] *Maszni v. Romania*, App. No. 59892/00 (Eur. Ct. H.R. September 21, 2006); *Tsfayo v. the United Kingdom,* App. No. 60860/00 (Eur. Ct. H.R. November 14, 2006).
[141] See also Iснiм, *supra* note 3, 131.
[142] *Burdov v. Russia* (No. 2), App No. 33509/04 (Eur. Ct. H.R. January 15, 2009), para. 154.

Electronic copy available at: https://ssrn.com/abstract=2631404

allies". Seen in this light, deficits such as the partiality or the lack of independence of domestic courts constitute severe obstacles to the administration of justice. This fact may call for and justify that particularly high sums are awarded for non-pecuniary damage in the field of "procedural justice".

Such policy reasons would, however, run counter to the rationale of just satisfaction as explained above (see Section III.1). The overall damage done to the multilevel administration of justice is a public interest concern. We submit, in contrast, that the purpose of awards on just satisfaction is individualistic, relating only to the victim's specific immaterial loss.

### d) Property

"Property" as a legal interest is protected in Art. 1 Prot. 1. The cases in our sample concern, e.g., the requisition of a house,[143] and the unlawful occupation of land.[144]

Octavian Ichim has asserted, with regard to the protected legal interest of property, that "the compensation for non-pecuniary damage [for property violations] is generally at the lowest level when compared with other violations".[145] Our results do not confirm this assertion: The award made in respect of non-pecuniary damage concerning the protected legal interest of "property" is statistically not significantly lower than regarding "procedural justice". The primary legal interest infringed in property cases is a financial (pecuniary) one. However, a financial satisfaction going beyond the material value of the property of course presupposes that an additional, non-material harm (for example, the disturbance of childhood memories) was caused by the interference with property. This type of non-material harm is arguably not substantially different from that involved in violations of "procedural justice". This may account for the "equal rank" of both protected legal interests.

### e) Personal and Political Liberty

The protected legal interest of "personal and political liberty" relates to the following Convention rights: the protection of freedom of thought, conscience, *Weltanschauung* and religion (Art. 9), the freedom of expression (Art. 10), freedom of assembly and association (Art. 11), and, finally, the right to free elections (Art. 3 Prot. 1). The cases

---

[143] *Fleri Soler and Camilleri v. Malta*, App. No. 35349/05 (Eur. Ct. H.R. September 9, 2006).
[144] *Trapani Lombardo and others v. Italy,* App. No. 25106/03 (Eur. Ct. H.R. November 16, 2006).
[145] ICHIM*, supra* note 3, 134.

Electronic copy available at: https://ssrn.com/abstract=2631404

in our sample concern, e.g., the conviction for publishing an article in a newspaper (Art. 10),[146] the conviction for participation in a press conference,[147] and the refusal to grant the status as a legal entity to the Moscow Branch of the Salvation Army (Art. 11 and Art. 9).[148]

Infringements of the protected legal interests of personal and political liberty lead to reduced awards (in comparison to those concerning the protected legal interest of "procedural justice"). This finding can be interpreted as follows: Infringements of protected legal interests that relate to the individual's conduct in the social and political sphere appear to cause less non-material harm to the individual than the infringement of procedural justice. The empirical results on non-pecuniary damage can be read as confirming that the Convention mechanism favors strictly individualized legal interests (such as physical integrity) over those legal interests that are more socially embedded (such as political liberties). The emphasis of strictly individualized legal interests over socially embedded legal interests is in line with those philosophical accounts on human rights that focus on individual human agency and personhood.[149]

## f)      Physical Liberty

The protected legal interest of "physical liberty" relates to the following rights: right to liberty (Art. 5(1)), including the procedural guarantees in cases of deprivation of physical liberty (Art. 5(2)–(5),[150] and the prohibition of imprisonment for debt (Art. 1 Prot. 4). An example from our sample is a detention order without sufficient reasons (Art. 5(1)).[151] The majority of cases in our sample relate to procedural aspects of Art. 5, such as excessive length of pre-trial detention (Art. 5(3)),[152] or the right to have the

---

[146] *Klein v. Slovakia,* App. No. 72208/01 (Eur. Ct. H.R. October 31, 2006).

[147] *Çetinkaya v. Turkey,* App. No. 75569/01 (Eur. Ct. H.R. June 27, 2006).

[148] *Moscow Branch of the Salvation Army v. Russia,* App. No. 72881/01 (Eur. Ct. H.R. October 5, 2006).

[149] See, e.g., GRIFFIN, *supra* note 136, 250.

[150] An alternative would be to assign procedural guarantees contained in Art. 5(2)–(5) to the protected legal interest of "procedural justice". We opined, however, that the connection with "physical liberty" is stronger than that with "procedural justice", because the procedural guarantees in Art. 5 essentially safeguard the substantive protected legal interest of physical liberty (allowing a person to be deprived of his or her physical liberty only in a fair procedure).

[151] *Ambruszkiewicz v. Poland,* App. No. 38797/03 (Eur. Ct. H.R. May 4, 2006).

[152] *Harazin v. Poland,* App. No. 38227/02 (Eur. Ct. H.R. January 10, 2006).

Electronic copy available at: https://ssrn.com/abstract=2631404

lawfulness of detention decided speedily by a court or by an authorized law officer (Art. 5(3) and (4)).[153]

The fact that infringements of the protected legal interest of "physical liberty" are associated with the lowest awards may be surprising at first sight. In general, one would assume that the non-material harm caused by illegal deprivation of physical liberty is substantial and should trigger high awards. An explanation for the lower amount of money granted in respect of non-pecuniary damage in these cases (relative to our reference category of "procedural justice") could be the frequent occurrence of some kind of misconduct by the applicant causally related to the gravity of the violation. For example, a person whose (procedural) rights were violated in the legal proceedings but who had attracted reasonable suspicion of having committed a serious crime was awarded a low sum of just satisfaction.[154] The rationale behind low awards made in respect of non-pecuniary damage in cases involving illegal acts by the applicant corresponds to a non-technical notion of "contributory fault" on the side of the applicant which triggered a prima facie lawful and proper law enforcement action.[155] In line with our explanation, Alastair Mowbray asserted that the Court makes "moral judgments about the nature of different types of applicants, such as convicted criminals and terrorists, when evaluating their claims for just satisfaction".[156]

---

[153] *Fuchser v. Switzerland,* App. No. 55894/00 (Eur. Ct. H.R. July 13, 2006).

[154] BYDLINSKI, *supra* note 2, 29, 97 (referring to *Doran v. Ireland*, App. No. 50389/99 (Eur. Ct. H.R. July 31, 2003)).

[155] See, e.g., *A. and others v. United Kingdom*, App. No. 3455/05 (Eur. Ct. H.R. February 19, 2009) – concerning a (disproportionate) derogation order under Art. 15 – where the Court held: "The decision whether to award monetary compensation in this case and, if so, the amount of any such award, must take into account a number of factors. The applicants were detained for long periods, in breach of Article 5 § 1, and the Court has, in the past, awarded large sums in just satisfaction in respect of unlawful detention (...). The present case is, however, very different. In the aftermath of the al-Qaeda attacks on the United States of America of 11 September 2001, in a situation which the domestic courts and this Court have accepted was a public emergency threatening the life of the nation, the Government were under an obligation to protect the population of the United Kingdom from terrorist violence. The detention scheme in Part 4 of the 2001 Act was devised in good faith, as an attempt to reconcile the need to prevent the commission of acts of terrorism with the obligation under Article 3 of the Convention not to remove or deport any person to a country where he could face a real risk of ill-treatment (…) All the applicants in respect of whom the Court has found a violation of Article 5 § 1 became, immediately upon release in March 2005, the subject of control orders. It cannot therefore be assumed that, even if the violations in the present case had not occurred, the applicants would not have been subjected to some restriction on their liberty."

[156] ALASTAIR MOWBRAY, *The European Court of Human Rights' Approach to Just Satisfaction*, Public Law 647, 658–59 (1997). For criticism, see DANNEMANN, *supra* note 72, 401.

Electronic copy available at: https://ssrn.com/abstract=2631404

### 2. Applicant- and Overall Context-Related Factors

In addition to the intensity of the violation, the applicant- and overall context-related factors are significantly associated with the award made in respect of non-pecuniary damage. First, concerning the applicant-related factors, legal persons are awarded a higher amount of money relative to natural persons. In line with the "substratum"-conception of legal persons (see Section III.3.); the higher "premium" can be accounted for by the fact that legal persons typically comprise a number of natural persons as the ultimately affected rights-holders. Therefore, it is also normatively justified that legal persons, on average, receive a higher amount of money in respect of non-pecuniary damage. Furthermore, as expected, the Court does not differentiate based on gender or nationality when making awards in respect of non-pecuniary damage.

Second, regarding the overall context-related factor, our empirical findings show that relative to new member states, Turkey and the old member states are awarded a "premium". This is in line with the Court's equity-principle: The ranking reflects the economic circumstances (i.e. price level), and potentially the severity of the harm in cases concerning Turkey.

### 3. Court Related-Factor

Interestingly, in cases in which the Court did not reach a unanimous decision, the victims are awarded a lower sum of just satisfaction. We explain this by interpreting the existence of a separate opinion as a marker for disagreement inside the Court on points of law. This may be explained as follows: The existence of a separate opinion can be viewed as an indicator for the complexity of the case. In complex cases, we assume that the *judge rapporteur* recommends a reduced award in respect of non-pecuniary damage, in order to incite the other judges to join the majority.

### VIII. Conclusion

This study is the first to empirically examine the awards made in respect of non-pecuniary damage under Art. 41 ECHR. There are no published tables on how the Court calculates these awards. The statements in the literature merely represent "informed guesses" on how the Court arrives at specific sums. Our empirical results contradict the frequently voiced academic reproach that the Court's practice is arbitrary or unprincipled.

Electronic copy available at: https://ssrn.com/abstract=2631404

According to the Court, the central principle for the calculation of the amount is equity. The three elements of the equity-principle as mentioned by the Court itself (seriousness of the violation, applicant- and overall context-related factors) were captured using data drawn from the HUDOC database.

The estimation results, in line with the equity-principle, show that there is a "ranking" among the protected legal interests under the Convention. Non-pecuniary harm suffered in the context of an infringement of protected legal interests of "life, physical and mental integrity" is compensated with the highest amount of money relative to non-pecuniary damage suffered in the context of "procedural justice". This can be interpreted as a "premium" paid for health-related violations.

"Private and family life" is also ranked higher than "procedural justice": Both first-ranking groups of legal interests are connected to human dignity and personal flourishment. Thus, non-pecuniary harm suffered in the context of an infringement of protected legal interests with a strong connection to aspects of human dignity is compensated with the highest amount of money (relative to non-pecuniary damage suffered in the context of "procedural justice").

"Procedural justice" is ranked higher than "personal and political liberty" and "physical liberty". This result is astonishing at first sight. It can be explained by the fact that – in cases relating to civil rights under Art. 6 – the Court takes into account material aspects (such as the length of time during which a domestic court judgment remained unenforced). These material aspects may lead to increased awards in respect of non-pecuniary damage.

Awards concerning the protected legal interest of property are statistically not significantly lower than those regarding "procedural justice". From a normative perspective, this seems adequate, given that the primary legal interest infringed in the property cases is a financial (pecuniary) one.

Non-pecuniary damage suffered for infringements of the protected legal interest of "physical liberty" attracts the lowest amounts of satisfaction (relative to "procedural justice"). An explanation for this practice might be that the Court reduces awards on non-pecuniary damage in cases which arose out of otherwise lawful and proper law

Electronic copy available at: https://ssrn.com/abstract=2631404

enforcement activities by domestic authorities. This practice is arguably consistent, although it risks disfavoring applicants who are suspected or convicted criminals.

The empirical results show that the only statistically significant applicant-related factor is whether the applicant is a legal person or a natural person. Gender and nationality are not associated with the amount awarded in respect of non-pecuniary damage: We found that neither women nor non-nationals of a respondent state are awarded a lower amount in respect of non-pecuniary damage than otherwise comparable men and nationals of the respondent states. So no sexism or racism taints the Court's practice in this field.

Sums awarded are adapted to the price level in the respondent state. This means, bluntly put, that torture in Germany pays more than torture in Bulgaria. Although this practice may appear frivolous from a pure and decontextualized dignity-perspective, it seems justified by the rationale of the financial compensation for immaterial damage. Given the fact that the harm done can never be truly compensated by money, one of its purposes is to provide solace to the victim or – in case of death – to his or her family.[157] This will depend on the purchasing power of the sum of money granted to the victims and their kin. Last but not least, the awards must be paid by governments with dramatically different budgets. The international law principle of sovereign equality demands that the real burden on the states should be equal. So respect of this principle, too, suggests that attention should be paid to the state's overall budget (which normally corresponds to the price level).

A relevant Court-related factor is the *disagreement inside the Court*, presumably due to the complexity of the case. Cases in which the Court did not decide unanimously but in which a concurring and/or dissenting opinion has been rendered besides the majority's decision, are awarded less relative to comparable cases with a unanimous decision. An explanation might be that the *judge rapporteur* recommends a lower amount of non-pecuniary damage in order to curry favor with potentially dissenting colleagues.

Our empirical analysis has certain limitations, due to our data selection, warranting further research. First, the cases examined in this study did not involve cases of death or disappearance of victims, and we thereby excluded some of the most

---

[157] See *supra* note 65 and accompanying text.

Electronic copy available at: https://ssrn.com/abstract=2631404

severe health-related cases. In further research, we aim to analyze such severe health-related cases in order to provide a complete picture of the "health premium". Furthermore, we aim to extend the present analysis to combinations of Court holdings finding a violation. Finally, we aim to analyze years other than 2006 in order to check the robustness of the results of the present study.

Despite these limitations, our empirical analysis shows that there is a pattern behind the Court's awards made in respect of non-pecuniary damage. The pattern in turn can be explained by ethical considerations of human dignity and individualized conceptions of personhood.

Electronic copy available at: https://ssrn.com/abstract=2631404

# Appendix A: Coding and Description of Variables

Table 1: Coding scheme

| Variable | Description |
| --- | --- |
| *Dependent variable* | |
| Amount awarded in respect of non-pecuniary damage | Denominated in euros[a] |
| | |
| *Seriousness of the violation: Intensity* | |
| Holding on a violation of a Convention right | Codes ranging from 1 to 119 for the violations or combinations of violations |
| Health topic | Codes ranging from 1 to 29 |
| | |
| *Seriousness of the violation: (Particularly) serious consequences of the violation* | |
| (Particularly) serious consequences of the violation | 0=no; 1=yes |
| | |
| *Applicant-related factors* | |
| Victim type | 1=natural person; 2=legal person; 3=State[b] |
| Sex | 0=male; 1=female |
| Nationality | Codes ranging from 1 to 49[c] |
| Place of birth[d] | Codes ranging from 1 to 49[c] |
| Current place of residence[e] | Codes ranging from 1 to 49[c] |
| Year of birth | Year |
| | |
| *Overall context-related factor* | |
| Respondent state | Codes ranging from 1 to 47 corresponding to the member states of the Council of Europe |
| | |
| *Court-related factor* | |
| Type of opinion concerning the holding | 1=unanimous decision concerning the holding; 2=(at least one) concurring opinion; 3=(at least one) dissenting opinion; 4=(at least one) concurring opinion and (at least one) dissenting opinion |

[a]In one case the amount awarded in respect of non-pecuniary damage was denominated in Cypriot Pounds and was subsequently converted to euros; [b]No inter-state complaint according to Art. 33 ECHR in raw data; [c]Country codes correspond to the countries of the 47 member states of the Council of Europe, 48=former Yugoslavia and 49="other countries"; [d]Place of birth only coded if nationality missing; [e]Current place of residence only coded if place of birth missing.

Electronic copy available at: https://ssrn.com/abstract=2631404

Table 2: Description of the specific health topics

| ECHR right | ECHR Art. | Health Topics | Examples | Code |
|---|---|---|---|---|
| Right to life | 2 | Execution/killing or life threatening situation by the State | | 1[a] |
| | | Emergencies | Armed conflicts; disasters; disease outbreaks; bioterrorism | 2[a] |
| | | Domestic violence[158] | | 3[a] |
| Freedom from torture and cruel, inhuman or degrading treatment or punishment | 3 | Torture while in police custody | | 4[b] |
| Freedom from slavery or forced labor | 4 | Household slavery; trafficking of women and children | | 5 |
| Right to liberty and security of the person | 5(1) | Forced hospitalization | | 6[b] |
| Right to privacy<br>- right to bodily integrity<br>- right to healthy environment<br>- occupational health | 8 | (Violation of ) Bodily integrity | Policeman hits demonstrator, and demonstrator suffers injuries | 7 |
| | | Adolescent health | Depression stemming from hostile social environment; violence; sexually transmitted infections; adolescent nutrition | 8[a] |
| | | Health services | Health care; equipment; staff; information; access to medicines; access (to medical treatment) | 9[a] |
| | | Clinical trials | Vulnerable population; case control; ethics; informed consent | 10 |
| | | Health research | Drug resistance; research policy | 11 |
| | | Health technology and health products | Essential medicines; biomedical technologies; in-vitro-fertilization; medical devices | 12 |
| | | Health systems | Health financing; health services (standard); health education (standard); medical education; health workforce | 13 |

---

[158] Also Art. 2, 3, 14 (+ 2 or +3), see *Opuz v. Turkey* App. No. 33401/02 (Eur. Ct. H.R. June 9, 2009).

Electronic copy available at: https://ssrn.com/abstract=2631404

| ECHR right | ECHR Art. | Health Topics | Examples | Code |
|---|---|---|---|---|
| | | Health legislation, health regulation | Health policies; social security | 14 |
| | | Infectious diseases | HIV/Aids; tuberculosis | 15 |
| | | Chronic diseases | Cancer; respiratory tract diseases | 16 |
| | | Reproductive and sexual health | Family planning; infertility; pregnancy; maternal health; breastfeeding; sexuality; sexually transmitted infections; female genital mutilation | 17[b] |
| | | Child health and development | Child abuse; custody | 18 |
| | | Ageing | Nursing facility care | 19 |
| | | Environmental health | Drinking water; sanitation; food safety; environmental pollution; climate change; electromagnetic radiation | 20[b] |
| | | Tobacco/substance abuse | Prevention of addiction | 21 |
| | | Occupational health | Workplace safety | 22 |
| | | Mental health[159] | Treatment; institutionalization | 23 |
| | | Domestic violence[160] | | 24 |
| | | Sex/gender[161] | | 25 |
| Freedom from discrimination | 14 + | Ageing | Age discrimination | 26 |
| | | Domestic violence[162] (if gender based) | | 27 |
| | | Sex/gender discrimination[163] | Discrimination on basis of gender/sex | 28 |
| | | Disability | | 29 |

[a]Relevant in raw data but not in selected sample; [b]Relevant in raw data and selected sample

---

[159] Also Art. 5-1.
[160] Also Art. 2, 3, 14 (+ 2 or +3), see *Opuz v. Turkey*, *supra* note 158.
[161] Also Art. 14 (+).
[162] Also Art. 2, 3, 14 (+ 2 or +3), see *Opuz v. Turkey*, *supra* note 158.
[163] Also Art. 8.

46

Electronic copy available at: https://ssrn.com/abstract=2631404

Table 3: Groups of respondent states for analysis (full sample)

| Group | Criteria | Corresponding countries |
|---|---|---|
| 1 | Old member states (accession 1949 – 1989) | Austria, Belgium, Cyprus, Denmark, Finland, France, Germany, Greece, Italy, Malta, Netherlands, Portugal, Spain, Sweden, Switzerland, United Kingdom |
| 2 | New member states (accession 1990 – 2003) | Albania, Azerbaijan, Bulgaria, Croatia, Czech Republic, Georgia, Hungary, Latvia, Lithuania, Republic of Moldavia, Poland, Romania, Russian Federation, Slovak Republic, Slovenia, The former Yugoslav Republic of Macedonia, Ukraine |
| 3 | "Outlier" old member state | Turkey |

Table 4: Protected legal interests and corresponding ECHR Article(s)

| Protected Legal Interest | Corresponding ECHR Article(s) |
|---|---|
| Life, physical and mental integrity | Right to life (Art. 2), prohibition of torture and inhuman or degrading treatment/punishment (Art. 3), prohibition of slavery and forced labor (Art. 4), abolition of the death penalty (Art. 1 Prot. 6), right to private life, under its head of "physical and psychological integrity of a person" (Art. 8) |
| Physical liberty | Right to liberty (Art. 5(1), procedural guarantees in cases of deprivation of personal liberty (Art. 5(2)–(5), prohibition of imprisonment for debt (Art. 1 Prot. 4) |
| Private and family life | Right to respect for private and family life (Art. 8), right to marry (Art. 12), right to education (Art. 2 Prot. 1), freedom of movement, choice of residence and freedom to leave the country (Art. 2 Prot. 4), prohibition of expulsion of nationals (Art. 3 Prot. 4), prohibition of collective expulsion of aliens (Art. 4 Prot. 4) |
| Personal and political liberty | Freedom of thought, conscience, *Weltanschauung* and religion (Art. 9), freedom of expression (Art. 10), freedom of assembly and association (Art. 11), right to free elections (Art. 3 Prot. 1) |
| Property | Right to property (Art. 1 Prot. 1) |
| Procedural justice | Right to fair trial contained (Art. 6), no punishment without law (Art. 7), the right to an effective remedy (Art. 13), procedural safeguards relating to the expulsion of aliens (Art. 1 Prot. 7), right of appeal in criminal matters (Art. 2 Prot. 7), right to compensation for wrongful conviction (Art. 3 Prot. 7), right not to be tried or punished twice (Art. 4 Prot. 7) |

Electronic copy available at: https://ssrn.com/abstract=2631404

| Protected Legal Interest | Corresponding ECHR Article(s) |
| --- | --- |
| Non-discrimination | Prohibition of discrimination (Art. 14), equality between spouses (Art. 5 Prot. 7), general prohibition of discrimination (Prot. 12) |
| ECHR procedure | Right to an effective individual application (Art. 34) |

48

Electronic copy available at: https://ssrn.com/abstract=2631404

## Appendix B: Descriptive Statistics

Table 5: Summary statistics

|  | Full sample | Natural persons |
|---|---|---|
| Amount awarded in respect of non-pecuniary damage | 4,053 (3,649) | 4,021 (3,628) |
| Protected interest: Life, physical and mental integrity | 2.58 | 2.65 |
| Protected interest: Physical liberty | 10.23 | 10.51 |
| Protected interest: Procedural justice | 57.37 | 57.19 |
| Protected interest: Private and family life | 2.80 | 2.88 |
| Protected interest: Personal and political liberty | 3.34 | 2.65 |
| Protected interest: Property | 23.68 | 24.12 |
| State: Turkey | 18.19 | 17.26 |
| State: Old member states | 36.49 | 36.73 |
| State: New member states | 45.32 | 46.02 |
| Type of opinion: Unanimous | 96.66 | 96.68 |
| Type of opinion: Presence of separate opinion | 3.34 | 3.32 |
| Victim type: Natural person | 98.06 | |
| Victim type: Legal person | 1.94 | |
| Gender: Male | | 65.04 |
| Gender: Female | | 34.96 |
| Nationality: Non-national of respondent state | | 4.09 |
| Nationality: National of respondent state | | 95.91 |
| *N* | 929 | 904 |

Amount awarded in respect of non-pecuniary damage: Mean is reported in euros, standard deviation in parentheses. All other variables are 0/1 variables, and the corresponding figures are reported as percentages.

Figure 1: Distribution of the amount awarded in respect of non-pecuniary damage (full sample)



Electronic copy available at: https://ssrn.com/abstract=2631404

## Appendix C: Estimation Results

Table 6: Estimation results (OLS regressions)

| | Model 1 | Model 2 | Model 3 |
|---|---|---|---|
| Protected interest: Life, physical and mental integrity | 0.72 | 0.73 | 0.71 |
| | (0.17)*** | (0.17)*** | (0.18)*** |
| Protected interest: Physical liberty | -0.59 | -0.58 | -0.60 |
| | (0.15)*** | (0.13)*** | (0.15)*** |
| Protected interest: Private and family life | 0.41 | 0.43 | 0.37 |
| | (0.20)** | (0.21)** | (0.20)* |
| Protected interest: Personal and political freedoms | -0.47 | -0.44 | -0.49 |
| | (0.19)** | (0.18)** | (0.20)** |
| Protected interest: Property | -0.10 | -0.13 | -0.11 |
| | (0.16) | (0.16) | (0.16) |
| State: Turkey | 0.39 | 0.48 | 0.40 |
| | (0.10)*** | (0.12)*** | (0.10)*** |
| State: Old member states | 0.63 | 0.62 | 0.64 |
| | (0.11)*** | (0.11)*** | (0.11)*** |
| Victim type: Legal person | 0.42 | 0.41 | |
| | (0.21)** | (0.22)* | |
| Type of opinion: Presence of separate opinion | | -0.54 | |
| | | (0.23)** | |
| Sex: Female | | | -0.06 |
| | | | (0.06) |
| Nationality: Non-national of respondent state | | | 0.18 |
| | | | (0.20) |
| Constant | 7.32 | 7.48 | 7.76 |
| | (0.23)*** | (0.27)*** | (0.07)*** |
| *N* | 929 | 929 | 904 |

*Significant at 10%; **Significant at 5%; ***Significant at 1%. Standard errors, clustered at the case level, in parentheses. Dependent variable: Natural logarithm of non-pecuniary damage. Omitted categories: Procedural rights, New member states, Unanimous opinion, Natural persons, Male, National of respondent state. Models 1 and 2 are estimated on full sample. Model 3 is estimated on the subsample of natural persons.

Electronic copy available at: https://ssrn.com/abstract=2631404