IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

ANDREW ALEXANDER, on behalf of himself
and all others similarly situated                                    PLAINTIFFS

V.                                              CIVIL ACTION NO. 4:20-CV-21-SA-JMV

PELICIA E. HALL et al.                                               DEFENDANTS

ORDER AND MEMORANDUM OPINION

On February 10, 2020, the Plaintiffs filed this lawsuit challenging the conditions at the Mississippi State Penitentiary, otherwise known as Parchman. They now seek class certification via a Motion to Certify Class [188]. The Defendants oppose the request and have also filed two separate Motions [164, 166] seeking to strike the Plaintiffs' experts. All pending Motions [164, 166, 188] are ripe for review.

*Factual and Procedural Background*

The Court will not set forth the procedural history of the case in its entirety; however, this recitation overlaps, to some extent, with the factual explanations that the Court has set forth in previous Orders in this case.

The Plaintiffs were housed at Parchman as inmates between February 17, 2017 and the present. There are fourteen named Plaintiffs in the Fifth Amended Complaint [75], but the Plaintiffs indicate that they "bring this action on behalf of themselves and a class of all persons who have been, are currently, or will be, confined at the Mississippi State Penitentiary at Parchman." [75] at p. 13. There are numerous Defendants, and the Fifth Amended Complaint [75] provides the following description of each of them:

> (1)     Pelicia Hall (Commissioner of the Mississippi Department of Corrections ("MDOC") from March 2017 through December 2019);

(2)     Tommy Taylor (Interim Commissioner of MDOC as of January 2020);

(3)     Marshal Turner (Superintendent of Parchman);

(4)     Jaworski Mallett (Deputy Commissioner for Institutions at MDOC);

(5)     Brenda Cox (Chief Security Officer and a Warden at Parchman);

(6)     Timothy Morris (Warden of Area I at Parchman);

(7)     Lee Simon (Deputy Warden of Area I at Parchman);

(8)     Marylen Sturdivant (Associate Warden of Area I at Parchman);

(9)     Wendell Banks (Warden of Area II at Parchman);

(10)    Verlena Flagg (Deputy Warden of Area II at Parchman);

(11)    Jewel Morris (Associate Warden of Area II at Parchman);

(12)    Leather Williams (person in charge of the K9 unit at Parchman);

(13)    Earnest King (Correctional Officer at Parchman);

(14)    Laquitta Meeks (Correctional Officer at Parchman);

(15)    Stanley Flagg (Correctional Officer at Parchman);

(16)    Claude Lee (Correctional Officer at Parchman);

(17)    Peggy Lathan (Correctional Officer at Parchman);

(18)    Olivia Westmoreland (Correctional Officer at Parchman);

(19)    Caren Webb (Correctional Officer at Parchman);

(20)    Terry Haywood (Correctional Officer at Parchman); and

(21)    Audrey Fields (Caseworker at Parchman).

*Id*. at p. 8-9.

In the Fifth Amended Complaint [75], the Plaintiffs allege that Parchman has for some time "been in an ongoing state of crisis" and is "so severely underfunded and staffed with persons such as Defendants herein, that inmates are routinely denied access to basic amenities such as clean water, plumbing, and electricity." *Id*. at p. 3. The Fifth Amended Complaint [75] further alleges that nine inmates have died at Parchman since January 1, 2020 and that:

> A slew of disturbing images and videos have surfaced showing that inmates are being required to defecate in plastic bags inside of their cells because their toilets are not functional.
>
> The underfunding and lack of Defendant's [sic] adherence to policies and/or customs that would have alleviated the complaints made herein, also forces people held in Mississippi's prison to live in squalor, endangering their physical and mental health. The prisons have failed to provide the basic necessities, such as a place to sleep. In Parchman, the units are subject to flooding. Black mold festers. Rats and mice infest the prison. Units lack running water and electricity for days at a time.

*Id*. at p. 3-4.

The Plaintiffs set forth allegations against each of the Defendants and essentially contend that they were aware of the unconstitutional conditions at Parchman but failed to take reasonable measures to abate the conditions. The Fifth Amended Complaint [75] alleges substantive claims for: (1) cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments (pursuant to 42 U.S.C. § 1983); and (2) conspiracy to deprive Plaintiffs of equal protection of the law (pursuant to 42 U.S.C. § 1985).

The Court has significantly narrowed the scope of this lawsuit. In a previous Order [87], the Court held that the Plaintiffs had adequately alleged a violation of their Eighth Amendment rights but also noted that the Prison Litigation Reform Act ("PLRA") barred the Plaintiffs from recovering compensatory damages for this claim absent physical injury. Therefore, to the extent

the Plaintiffs sought compensatory damages under that claim, the Court granted dismissal. *See* [87] at p. 13 ("Thus, to the extent the plaintiffs seek compensatory damages based on emotional or mental injury, such claims are properly dismissed."). The Court dismissed the Plaintiffs' Section 1985 conspiracy claim in full because the Plaintiffs made no allegation that the Defendants' conduct was racially motivated, as required for a Section 1985 claim to be viable.

In a later ruling, the Court articulated the limited scope of the case:

> The scope of this lawsuit is very limited. The Plaintiffs' only viable claims at this stage are for potential nominal and punitive damages based upon alleged Eighth Amendment violations.

[146] at p. 10.

After the parties engaged in class certification discovery, the Plaintiffs filed a Motion to Certify Class [188]. In their Memorandum [189], the Plaintiffs articulate the proposed class and subclasses as follows:

> Plaintiffs propose a single overarching class with four subclasses as defined below.
>
> The "class period" is defined as February 7, 2017, through December 31, 2021.
>
> First, the "Class" is defined [as] "all persons incarcerated at Parchman Unit 29 for more than two weeks at any point during the class period and all persons incarcerated at Parchman Unit 32 for any period during the class period." Injuries suffered by class members will place them in one or more of the following four subclasses. The Parchman Class seeks only nominal and punitive damages for the violation of the class members['] Eighth Amendment rights, class members with physical injuries will fall into one or more of the following subclasses.
>
> The "Violence Subclass" is defined as "all persons incarcerated at Parchman Unit 29 and/or Unit 32 who were subjected to physical violence during the class period." The Violence Subclass would seek nominal, compensatory, and punitive damages.

4

The "Unaffiliated Subclass" is defined as "all persons incarcerated at Parchman Unit 29 and/or Unit 32 who were not affiliated with any gang during the class period." The Unaffiliated Subclass seeks nominal and punitive damages above those members of the Parchman Class reflecting the increased risk unaffiliated prisoners experienced while housed at Parchman Unit 29.

The "Illness Subclass" is defined as "all persons incarcerated at Parchman Units 29 or 32 during the class period who became ill due to the food, water, vermin, or other conditions within those units." The Illness Subclass seeks nominal, compensatory, and punitive damages.

The "Structural Injuries Subclass" is defined as all persons who suffered a physical injury as a direct result of the structural conditions of Units 29 and/or 32, not including those injuries identified in the Violence Subclass or Illness Subclass." The Structural Injuries Subclass seeks nominal, compensatory, and punitive damages.

In the alternative, Plaintiffs move this Court to bifurcate this matter and certify a "Liability Class" defined as "all persons incarcerated at Parchman Unit 29 for more than two weeks at any point during the class period and all persons incarcerated at Parchman Unit 32 for any period of time during the class period from February 7, 2017, through December 31, 2021." This class would exist at Phase I of the bifurcated trial and establish whether the conditions at Parchman violated the class members['] Eighth Amendment rights, with Phase II consisting of individual trials for class members where they would prove damages and a separate opt-in class for all persons who did not sustain physical injuries and merely seek nominal and punitive damages against the Defendants.

[189] at p. 5-6.

The Defendants argue that the Plaintiffs cannot satisfy the Rule 23 standard for class certification. Additionally, the Defendants filed Motions [164, 166] seeking to strike the Plaintiffs' experts, arguing that the proposed testimony of those experts (Jonathan Shefftz and Lenard Vare) should not be considered for purposes of the class certification analysis.

*Analysis and Discussion*

At the outset, the Court feels compelled to address an issue associated with the scope of the lawsuit. Many of the Plaintiffs' proposed subclasses seek compensatory damages. In their Response Memorandum [197], the Defendants contend that this entire premise is unfounded as the Court has already held that compensatory damages are not recoverable in this case. The Plaintiffs contend that "Defendants are inaccurately reciting this Court's previous orders regarding compensatory damages. Defendants argue repeatedly that Plaintiffs cannot recovery any compensatory damages due to this Court's orders. Contrary to Defendants['] inaccurate statements, this Court specifically 'dismissed the claims for compensatory damages to the extent they are based on emotional or mental injury.'" [201] (citing [87]; additional citations omitted).

Further clarification on this issue is obviously necessary. Under the PLRA, "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). As this Court explained in its previous ruling, "a prisoner is prevented 'from seeking compensatory damages [for emotional or mental injuries] for violations of federal law where no physical injury is alleged.' However, 'a prisoner can, absent a showing of physical injury, pursue punitive or nominal damages based upon a violation of his constitutional rights.'" [87] at p. 13 (quoting *Mayfield v. Tex. Dept. of Criminal Justice*, 529 F.3d 599, 605-06 (5th Cir. 2008)) (internal citation omitted). The PLRA does not preclude recovery of compensatory damages if a prisoner has suffered physical injuries. 42 U.S.C. § 1997e(e); *see also*, *e.g.*, *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997).

With these well-settled principles in mind, the Court turns to its prior rulings, as well as the allegations of the Fifth Amended Complaint [75]. In its November 2, 2021 Order [87], the

6

Court specifically granted the Defendants' request for dismissal of the Plaintiffs' claims "for compensatory damages to the extent they are based on emotional or mental injury." [87] at p. 13. On March 22, 2023, the Court entered an Order and Memorandum Opinion [146] wherein it addressed the Defendants' Motion to Dismiss and to Partially Vacate Prior Order [127]. In that ruling, the Court reaffirmed the prior ruling and declined to vacate the prior Order. *See generally* [146]. However, the Court does note that its language in that ruling specifically provided that "[t]he scope of this lawsuit is very limited. The Plaintiffs' only viable claims at this stage are for potential nominal and punitive damages based upon alleged Eighth Amendment violations." [146] at p. 10. The Defendants latch onto this language and essentially contend that the Court dismissed the Plaintiffs' request for compensatory damages—even those that involved a physical injury. Although this is not necessarily an unrealistic interpretation of this language, it does cut against the spirit of this Court's ruling, particularly to the extent that the ruling simply reaffirmed its prior ruling that made clear the dismissal of compensatory damages was only "to the extent they are based on emotional or mental injury." [87] at p. 13. Furthermore, nothing in the PLRA's language precludes recovery for compensatory damages when physical injuries have occurred and to altogether preclude such recovery here would be unjust.

Therefore, the Court clarifies that the Plaintiffs are not precluded from recovering compensatory damages to the extent that they are based on *physical* injury. Having resolved that matter, the Court turns to the class certification issue.

I. *Motion for Class Certification [188]*

"Rule 23 governs whether a proposed class falls within the limited exception to 'the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Ibe v. Jones*, 836 F.3d 516, 528 (5th Cir. 2016) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01, 99

S. Ct. 2545, 61 L. Ed. 2d 176 (1979)). "To obtain class certification, parties must satisfy the following Rule 23(a) requirements: (1) numerosity — the class is so numerous that joinder of all members is impracticable; (2) commonality — there are questions of law or fact common to the class; (3) typicality — the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) adequacy of representation — the representative parties will fairly and adequately protect the interests of the class." *Ward v. Hellerstedt*, 753 F. App'x 236, 243 (5th Cir. 2018) (citing and quoting FED. R. CIV. P. 23(a); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011); *Ibe*, 836 F.3d at 528) (internal quotation marks omitted). "In addition to each of the Rule 23(a) requirements, one Rule 23(b) requirement must be met for a class to be certified." *Id*. (citing FED. R. CIV. P. 23(b); *Dukes*, 564 U.S. at 345, 131 S. Ct. 2541).

Notably, "Rule 23 does not set forth a mere pleading standard. The party seeking class certification bears the burden of demonstrating that the requirements of Rule 23 have been met." *Ibe*, 836 F.3d at 528 (quoting *Dukes*, 564 U.S. at 350, 131 S. Ct. 2541; *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 737-38 (5th Cir. 2003)) (internal quotation marks omitted). The Fifth Circuit has made clear that district courts must engage in a rigorous analysis at this stage:

> [B]efore certifying a class, a district court must conduct a rigorous analysis of the Rule 23 prerequisites, which requires it to *look beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law* in order to make a meaningful determination of the certification issues. In light of this imperative, this court has held that 'when certifying a class a district court must detail with sufficient specificity how the plaintiff has met the requirements of Rule 23.

*Ward*, 753 F. App'x at 244 (quoting *Yates v. Collier*, 868 F.3d 354, 362 (5th Cir. 2017); *Vizena v. Union Pac. R.R. Co.*, 360 F.3d 496, 503 (5th Cir. 2004)) (internal quotation marks and additional citations omitted; emphasis added). The "rigorous analysis" requirement "is not some pointless

8

exercise. . . It matters." *Sampson v. USAA*, 83 F.4th 414, 418 (5th Cir. 2023) (quoting *Chavez v. Plan Benefit Servs., Inc.*, 957 F.3d 542, 547 (5th Cir. 2020)).

"Rule 23(a)(2) demands that the putative class members' claims 'must depend upon a common contention' that 'must be of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Yates*, 868 F.3d at 361 (quoting *Dukes*, 564 U.S. at 350, 131 S. Ct. 2541). To that end, "what matters for Rule 23(a) is not the raising of common questions—even in droves—but, rather the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* (quoting *Dukes*, 564 U.S. at 350) (internal punctuation and additional citations omitted).

With this overarching obligation in mind, the Court will address the Plaintiffs' contentions.

A.      *Numerosity*[1]

"The Fifth Circuit has held that when conducting a numerosity analysis, the focus should not be on sheer numbers alone, but instead 'on whether joinder of all members is practicable in view of the numerosity of the class and all other relevant factors.'" *Recinos-Recinos v. Express Forestry, Inc.*, 233 F.R.D. 472, 478 (E.D. La. 2006) (quoting *Phillips v. Joint Legislative Comm.*, 637 F.2d 1014, 1022 (5th Cir. 1981); *Pederson v. La. St. Univ.*, 213 F.3d 858, 868 (5th Cir. 2000)) (additional citation omitted). The number of members in a proposed class is not determinative, but the Fifth Circuit has previously recognized that a class of 100 to 150 members "is within the range that generally satisfies the numerosity requirement." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (citations omitted).

---

[1] The Defendants do not contest numerosity. However, the Fifth Circuit has made clear that district courts bear an independent obligation to rigorously analyze the prerequisites. *See Stirman v. Exxon Corp.*, 280 F.3d 554, 563 n. 7 (5th Cir. 2002). The Court will therefore analyze numerosity on its merits.

Here, the Defendants' own expert, Dr. Philip J. Cross, provided an opinion that "the maximum number of inmates who were housed at Unit 29 and/or Unit 32 for some period of time between January 1, 2018 through February 29, 2020 is 3,994." [190], Ex. 6 at p. 7. Notably, this date range does not include the entire time period set forth in the Plaintiffs' proposed class, indicating that the actual number would likely easily exceed 4,000 individuals.

Considering the sheer volume, in addition to the other obstacles that the Plaintiffs would face in pursuing individual actions, the Court has no trouble concluding that the numerosity prerequisite is satisfied here.

B.    *Commonality*

"To satisfy Rule 23(a)'s commonality requirement, 'the putative class members' claims must depend upon a common contention,' which 'must be of such a nature that it is capable of class-wide resolution.'" *Ward*, 753 F. App'x at 245 (quoting *Yates*, 868 F.3d at 361; *Dukes*, 564 U.S. at 350, 131 S. Ct. 2541). "In other words, determining whether such common contention is true or false must allow for resolution of an issue that is central to the validity of each one of the claims in one stroke." *Id*. (citations and internal quotation marks omitted). Furthermore, "to establish commonality, the plaintiffs must show that the class members have suffered the same injury. While the term 'injury' is generally tied to the concept of damages, [the Fifth Circuit] has recognized that 'an instance of injurious conduct, which would usually relate more directly to the defendant's liability may constitute the same injury' for purposes of commonality. Thus, commonality may exist even where the plaintiffs' alleged damages are diverse." *Id*. (quoting *In re Deepwater Horizon*, 739 F.3d 790, 810-11 (5th Cir. 2014)) (additional citations and quotation marks omitted). "In short, the common questions identified must be dispositive of the claims. If they are not—if, for instance, after the common questions are answered one way or another

10

individualized inquiries to determine liability would be needed—then commonality has not been established." *M.D. v. Perry*, 294 F.R.D. 7, 28 (S.D. Tex. 2013) (citing *Ahmad v. Old Republic Nat. Title Ins. Co.*, 690 F.3d 698, 704 (5th Cir. 2012)) (additional citations omitted).

Here, the Plaintiffs accurately concede that while they broadly allege violations of their Eighth Amendment rights, "this common question is not specific enough to meet the requirements of Rule 23." [189] at p. 5. What they contend, though, is that their "allegations are susceptible to class-wide resolution as they all turn on two factors: 1) what did Defendants know about the risks experienced by those housed at Parchman Units 29 and 32 and 2) what did they do to mitigate those risks." *Id*. at p. 9.

It bears repeating here the proposed class and subclasses that the Plaintiffs seek certification of:

> The "class period" is defined as February 7, 2017, through December 31, 2021.
>
> First, the "Class" is defined [as] "all persons incarcerated at Parchman Unit 29 for more than two weeks at any point during the class period and all persons incarcerated at Parchman Unit 32 for any period during the class period." Injuries suffered by class members will place them in one or more of the following four subclasses. The Parchman Class seeks only nominal and punitive damages for the violation of the class members['] Eighth Amendment rights, class members with physical injuries will fall into one or more of the following subclasses.
>
> The "Violence Subclass" is defined as "all persons incarcerated at Parchman Unit 29 and/or Unit 32 who were subjected to physical violence during the class period." The Violence Subclass would seek nominal, compensatory, and punitive damages.
>
> The "Unaffiliated Subclass" is defined as "all persons incarcerated at Parchman Unit 29 and/or Unit 32 who were not affiliated with any gang during the class period." The Unaffiliated Subclass seeks nominal and punitive damages above those members of the Parchman Class reflecting the increased risk unaffiliated prisoners experienced while housed at Parchman Unit 29.

> The "Illness Subclass" is defined as "all persons incarcerated at Parchman Units 29 or 32 during the class period who became ill due to the food, water, vermin, or other conditions within those units." The Illness Subclass seeks nominal, compensatory, and punitive damages.
>
> The "Structural Injuries Subclass" is defined as all persons who suffered a physical injury as a direct result of the structural conditions of Units 29 and/or 32, not including those injuries identified in the Violence Subclass or Illness Subclass." The Structural Injuries Subclass seeks nominal, compensatory, and punitive damages.

*Id*. at p. 5-6.

Arguing that commonality is satisfied, the Plaintiffs' Memorandum [189] spends many pages listing questions that they refer to as "common questions of law and fact" for the Parchman Class as well as each subclass. *See generally id.* at p. 6-10. For instance, as to the proposed Violence Subclass, the Plaintiffs contend that the following common questions of law and fact exist:

> Whether the failure to take reasonable measures to address the serious structural issues at the buildings—including the hollow walls, ineffective locks, and inadequate light and power—in Unit 29 created conditions that permitted incarcerated persons to engage in violent acts on other incarcerated persons;
>
> Whether the failures to take reasonable measures to address the constant flow of contraband into Unit 29 created conditions where violence was both more likely and easier for incarcerated persons to accomplish;
>
> Whether the failures to house high risk offenders in housing designed and capable of housing them created conditions where violence was more likely and easier;
>
> Whether the imposition of collective punishment created conditions where violence was more likely;

12

> Whether the lack of properly trained and supervised staff created conditions where violence was more likely and easier for staff and/or incarcerated persons to accomplish;

> Whether the lack of sufficient staff created conditions where violence was more likely and easier for incarcerated persons to accomplish;

> Whether the failure to take reasonable efforts to identify and root out staff corruption created conditions where violence was more likely and easier for staff and/or incarcerated persons to accomplish;

> Whether the failure to take gang affiliation into account in housing decisions created conditions where the risk of violence was increased; and

> Whether these failures are a causation of the injuries suffered by those members of the Violence Subclass.

*Id*. at p. 10-11.

The Plaintiffs include similar lists of purported common issues relevant to four different groups of Defendants, which they break down as follows: "administrative, supervisory, staff, and contraband." *Id*. at p. 14. As with the purported common issues relevant to the proposed subclasses, the Plaintiffs spend several pages listing common questions of law and fact as to each category of Defendants. For example, as to the administrative category—which includes Hall and Turner—they include questions such as:

> Whether Defendants Hall and Turner were aware that the actions allegedly taken to handle the crises of staffing, security, and physical conditions were ineffective;

> . . .

> Whether Defendants Hall and Turner consciously chose courses of action that were known to be ineffective at remedying the staffing, security, and physical conditions despite having more effective options;

> Whether Defendants Hall and Turner knew that their staff were inadequately trained . . .

13

*Id*. at p. 14-15.

For the supervisory category of Defendants—which includes Cox, Morris, Simon, and Williams—the Plaintiffs list numerous questions to be resolved such as:

> Whether they fostered a policy of acquiescence to the unconstitutional conditions of confinement at Unit 29;

> Whether they knew that due to inadequate supervision of the class members by their subordinates that information regarding assaults, threats, and unacceptable living conditions were often first learned of through third-party complaints;

> Whether they instructed their subordinates to ignore gang affiliations, exacerbating the risk of violence, death, and misery at Unit 29 . . .

*Id*. at p. 17-18.

In the Defendants' view, this proposed course of action is not practical, and they contend that the alleged common questions of law and fact, even if answered, would not resolve the Plaintiffs' claims. In particular, they emphasize that since they have been sued in their individual capacities, they are entitled to a qualified immunity defense and therefore "[t]he common questions Plaintiffs recite are not 'dispositive of the claims' and will not 'generate common answers' because there are so many individualized questions mandated by the standard to render these Defendants individually liable for money damages and resulting from the 'purported class members' individual circumstances and claims." [197] at p. 10 (quoting *Chavez*, 957 F.3d at 547-48). They further reiterate that holding Defendants individually liable requires a highly individualized Defendant-by-Defendant inquiry—but, not only that—it also requires a Plaintiff-by-Plaintiff inquiry specifically tailored to the precise type of harm that each Plaintiff allegedly suffered. In addition, the Defendants, noting that the Plaintiffs' proposed class spans a period of nearly five

14

years and includes individuals housed in Unit 29 for more than two weeks and individuals housed

in Unit 32 for any period of time, aver that:

> Plaintiffs complain about conditions that span a five year period, so
> the Court must evaluate whether "(1) *each* defendant knew of a
> substantial risk of serious bodily harm to *each* plaintiff" *at specific
> points in time* and whether *each* Defendant "(2) disregarded that
> risk" by failing to take measures to abate it *at specific points in time*.
> The standard requires proof of not only what each Defendant knew,
> and when, but also what exactly each Defendant did or should have
> done *in that specific situation*, *at the time*.

*Id*. at p. 15 (quoting [87] at p. 7; emphasis in original).

Generally speaking, the Eighth Amendment mandates that prison officials "provide

humane conditions of confinement; they must ensure that inmates receive adequate food, clothing,

shelter, and medical care, and must take reasonable measures to ensure the safety of the inmates."

*Tellis v. LeBlanc*, 2021 WL 4267513, at *5 (W.D. La. Sept. 20, 2021) (quoting *Gates v. Cook*, 376

F.3d 323, 332 (5th Cir. 2004)). "The elements of an Eighth Amendment claim are met when a

prison official '1) shows a subjective deliberate indifference to 2) conditions posing a substantial

risk of serious harm to the inmate.'" *Id*. (quoting *Gates*, 376 F.3d at 333).

As the Defendants point out, the qualified immunity defense is applicable as each of the

Defendants have been named in their individual capacities. *See Keim v. City of El Paso*, 162 F.3d

1159, 1998 WL 792699, at *3 (5th Cir. 1998); *Gaines v. Jefferson Cnty. Sch. Dist.*, 705 F. Supp.

3d 664, 677 (S.D. Miss. 2023). In fact, this Court previously engaged in a qualified immunity

analysis in a previous Order [87].

"The doctrine of qualified immunity shields government officials performing discretionary

functions from civil liability insofar as their conduct does not violate clearly established

constitutional rights which a reasonable person would have known." *Meadours v. Ermel*, 483

F.3d 417, 422 (5th Cir. 2007) (quoting *Flores v. City of Palacios*, 381 F.3d 391, 393-94 (5th Cir.

2004)) (internal quotation marks and additional citation omitted). The Fifth Circuit has held that the consideration of individual Defendants' conduct collectively in the qualified immunity context is error. *Id*. at 421 (holding that "the district court erred in considering the officers' actions collectively."). In other words, the reviewing court must consider each individual Defendants' conduct separately in order to properly determine whether qualified immunity shields a particular Defendant from liability. *See*, *e.g.*, *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012) (explaining that the reviewing court should "evaluate each officer's actions separately, to the extent possible.").

Thus, to prevail on an Eighth Amendment claim in the context of this case, each Plaintiff must show that a particular Defendant was aware of each specific allegedly unconstitutional condition to which each Plaintiff was subjected and did not respond as a reasonable officer would have done under the circumstances. This is necessarily a highly fact intensive inquiry. *See*, *e.g.*, *Edwards v. Oliver*, 31 F.4th 925, 932 (5th Cir. 2022) (describing the qualified immunity analysis as "fact-intensive"); *Garza v. Escobar*, 386 F. Supp. 3d 794, 814 (S.D. Tex. 2019) (same). Considering the wide range of the Plaintiffs' alleged injuries for which they seek to hold numerous individual Defendants occupying different positions liable, potentially proceeding as a class action in light of the necessarily individualized inquiry gives the Court concern.

This same concern exists when considering the significant length of the class period— February 7, 2017 through December 31, 2021. The proposed class includes "all persons incarcerated at Parchman Unit 29 for more than two weeks at any point during the class period and all persons incarcerated at Parchman Unit 32 for any period during the class period." [189] at p. 5. The experiences of the Plaintiffs in these classes vary greatly—many of them complain of significantly different issues and lived in different buildings and zones. *See* [196], Ex. 7 (listing

housing history for John Doe Plaintiffs 1-14). Additionally, with the proposed class period spanning such a broad time period, the conditions at Parchman experienced by all proposed class members could vary greatly. For instance, the Defendants provided documentation of sample work orders from Parchman's maintenance department indicating the work that was performed to address various issues associated with the facilities, which spanned from issues with toilets and sinks to heating and lighting. *See generally* [196], Ex. 1.[2] That does not even address the fact that many of the Defendants were not employed at Parchman throughout the entire class period and/or were employed at different times throughout the period. *See*, *e.g.*, [196], Ex. 24 at p. 6 (Deposition of Marylen Sturdivant indicating that she worked at Unit 29 from 2017 through July 2019); [196], Ex. 24 at p. 5-6 (Deposition of Pelicia Hall explaining that she was MDOC Chief of Staff from 2015 through 2017 and Commissioner of Corrections from 2017 through 2020); [196], Ex. 31 at p. 6 (Deposition of Tavoris Emerson stating his term of employment with MDOC was 2017 through 2020). These considerations give this Court significant concerns as to whether there is a common contention "of such a nature . . . that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Dukes*, 564 U.S. at 350, 131 S. Ct. 2541.

These discrepancies are, again, particularly concerning because qualified immunity has been raised. Although the Plaintiffs have apparently attempted to alleviate this concern by separating the Defendants into four separate categories, they still propose that multiple Defendants be grouped together. This does not absolve the reservations that this Court has.[3]

---

[2] The Court is aware that the Plaintiffs contend that, regardless of the work that was performed at the facility, the conditions remained inadequate. However, the Court points out this fact for the limited purpose of noting that the conditions that all potential class members faced were not identical.

[3] The Court notes that the Plaintiffs make no argument as to the Defendants' invocation of qualified immunity.

Although not completely analogous, the Court finds noteworthy the decision of the District Court for the Southern District of Mississippi in *Humphrey v. Hall*, 2020 WL 6792686 (S.D. Miss. May 11, 2020) (report and recommendation ultimately adopted in full at *Humphrey v. Hall*, 2020 WL 4893007 (S.D. Miss. Aug. 20, 2020)). There, the plaintiff, a *pro se* prisoner who was housed at the South Mississippi Correctional Institution, sought class certification to pursue challenges to the facility's conditions of confinement. *Hall*, 2020 WL 6792686 at *1. Although the district court found the certification request to be improper in multiple respects, this Court finds particularly pertinent the district court's discussion of the commonality requirement:

> Although Humphrey alleges that Defendants' staffing policies have led to the complained of injuries, the undersigned is not convinced that commonality exists. Although Humphrey contends that the class members have been threatened and assaulted, there are different reasons for the assaults. Further, some of the assaults were conducted solely by gang members, while other assaults were ordered by guards. Finally, he only alleges that himself and one other class member have needed medical treatment because of the conditions of confinement, as opposed to needing medical treatment as a result of an assault.

*Id.* at *3.

This Court is of course cognizant that the plaintiff in *Humphrey* was not represented by counsel which may have contributed to the failure to develop the theory as to commonality. Nonetheless, the Court sees similarities in *Humphrey* and the case at bar. Notably, the Plaintiffs' alleged injuries here span from consuming contaminated food and water, to being assault victims, to being injured because of structural conditions of the facility. These purported injuries thus differ significantly—much like the proposed class in *Humphrey*. Even among the subclasses, the discrepancies could be quite significant. For instance, in the "Illness Subclass," the Plaintiffs seek to include all individual Plaintiffs who "became ill due to the food, water, vermin, or other conditions within those units." [189] at p. 6. The circumstances surrounding an illness from food

as opposed to illness from "other conditions" such as being cold could vary significantly. In fact, Plaintiffs testified about sickness from different causes. *See*, *e.g.*, [190], Ex. 13 at p. 7 (John Doe 7 testifying that he was "injur[ed] by the cold weather" by experiencing "fever, cough, and shivering"); [190], Ex. 2 at p. 4 (John Doe 2 testifying that he experienced being "nauseated and throwing up" because of eating the food served to him). The Court is additionally concerned about the vagueness of the phrase "other conditions." It is not entirely clear what conditions the Plaintiffs seek to include in that catch-all category. This Court has the same skepticism that the District Court for the Southern District of Mississippi articulated in *Humphrey*.

While unpublished, the Fifth Circuit's 2018 decision in *Ward* is also noteworthy. 753 F. App'x 236. There, the plaintiffs sought class certification in their lawsuit pertaining to the length of detention of persons accused of crimes pending competency proceedings. *Id*. at 238-29. The Fifth Circuit explained the factual backdrop as follows:

> Under Texas law, criminal defendants adjudged incompetent to stand trial and individuals acquitted of crimes by reason of insanity may, under certain circumstances specified by statute, be committed to facilities for inpatient mental health treatment, restoration services, evaluation and/or observation. The State of Texas does not have enough beds in its hospitals, which generally operate at full capacity, to accommodate at once all persons who have been committed for inpatient services. To equitably allocate available hospital beds, the State generally uses a "first-come, first served" approach. Individuals who are awaiting admission to a state hospital are generally detained in county jails pending their transfer, sometimes for months.

*Id*.

Seven of the representative plaintiffs alleged that "though they had been ordered committed for inpatient competency restoration services by Texas courts, they had been detained in county jails awaiting admission to state hospitals for periods ranging from 15 to 27 weeks." *Id*. at 239. Two other representative plaintiffs alleged that "though they had been acquitted of criminal

charges by reason of insanity and ordered committed to maximum security unit facilities for evaluation and treatment, they had been detained in county jails awaiting admission to such facilities for two weeks to ten weeks, respectively." *Id*. The plaintiffs sought certification of two different classes and requested a declaration that their Fourteenth Amendment due process rights had been violated, as well as injunctive relief. *Id*.

The district court certified the following two classes:

> (1) All persons who are now, or will be in the future, charged with a crime in the State of Texas, and (a) who are ordered to a Texas Department of State Health Services facility where they are to receive competency restoration services; and (b) for whom the Texas Department of State Health Services receives a court order; but (c) who remained detained in a Texas county jail ("Incompetent Detainee(s)"); and

> (2) All persons who are now, or will be in the future, charged with a crime in the State of Texas and who are found not guilty by reason of insanity, and (a) who are ordered to receive evaluation-treatment services at a Texas Department of State Health Services facility; (b) for whom the Texas Department of State Health Services receives the court order; but (c) who remain detained in a Texas county jail for more than 14 days ("Insanity Aquittees").

*Id*. at 240.

In analyzing commonality, the district court noted the following common questions of fact in the case:

> Whether incompetent detainees and insanity acquittees who are committed to the custody of Hellerstedt's Department for restoration of their mental capacity so they may be tried or committed for evaluation to determine if they can continue to be confined, spend extended periods of time in county jails without receiving restoration or evaluation services; and, if so, whether Hellerstedt uses a policy or procedure to ensure that any resulting delay in the implementation of such services and the place and manner in the implementation of those services are the product of the judgment rendered by a qualified professional.

*Id*. at 245.

On appeal, the Fifth Circuit considered "the propriety of the district court's class certification order from a procedural standpoint." *Id*. at 243. Finding error, the court noted that "the district court did not explain at all, much less with specificity, how the determination of such questions would 'resolve an issue that is central to the validity of each of the putative class member's claims in one stroke.'" *Id*. at 246 (quoting *Yates*, 868 F.3d at 361). Further, the court explained "it is difficult to appreciate from a plain reading of the common questions identified by the district court how such questions are even capable of being resolved on a class-wide basis. The district court's use of the phrase 'extended periods of time' as an integral part of its stated common questions is particularly problematic, as such phrase is ambiguous." *Id*. The Fifth Circuit held that the district court's ruling also created other issues: "[t]he district court's failure to substantively address actual or potential differences in purported class members' individual circumstances and claims is also troublesome, since considering dissimilarities among claimants is essential to determining whether even a single common question exists. . . it is incumbent on the district court to consider and discuss the facts of this case, as well as the elements of Plaintiffs' claims, prior to rejecting Defendant's argument that dissimilarities among individual claimants obviate commonality." *Id*. (citing *Dukes*, 564 U.S. at 358, 131 S. Ct. 2541; *Perry*, 675 F.3d at 843-44). After noting additional errors, the Fifth Circuit reversed and remanded. *Id*. at 248.

In this case, this Court harbors many of the same concerns that the Fifth Circuit articulated in *Ward*. The Court has above identified significant dissimilarities among the Plaintiffs' claims here, in light of the different experiences to which each of the Plaintiffs were allegedly subjected. It does not appear to this Court that resolving the common questions identified by the Plaintiffs would resolve the validity of each of the class members' claims "in one stroke." *Id*. at 246 (citations omitted).

The District Court for the Western District of Louisiana considered a class certification issue relatively recently in *Tellis*, 2021 WL 4267513. There, the plaintiffs, inmates at David Wade Correctional Center ("DWCC"), sought class certification to challenge "conditions of confinement for inmates on extended lockdown at DWCC and to challenge the mental health care provided to inmates on extended lockdown." *Id*. at *1. The plaintiffs alleged violations of the Eighth Amendment, First Amendment, Americans with Disabilities Act, and the Rehabilitation Act. *Id*. The plaintiffs sought certification of two classes, which the district court described as follows:

> First, a class comprised of all prisoners who are or will be subjected to extended lockdown at DWCC that will pursue the Eighth Amendment and First Amendment claims. Second, a subclass of all individuals on extended lockdown at DWCC who have or are perceived as having a qualifying disability related to mental health, as defined within the Americans with Disabilities Act that will pursue the ADA and RA claims.

*Id*.

In analyzing commonality on the Eighth Amendment claims (the first class), the district court explained that the plaintiffs allege that inmates subjected to "extended lockdown are exposed to a substantial risk of harm by policies causing or related to social isolation, enforced idleness, and indefinite exposure to extended lockdown conditions. They cite to evidence demonstrating that inmates on extended lockdown are usually confined to their cell for twenty-three hours per day; that those on 'yard restriction' are confined to their cell for nearly twenty-four hours per day, except for fifty minutes of 'yard time' per weekend . . .; and that phone calls are limited to ten minutes per month." *Id*. at *5. The plaintiffs submitted reports of two experts detailing the substantial risk of harm that these conditions pose to every member of the putative class. *Id*.

Arguing against commonality, the defendants cited their own expert's report that "inmates at DWCC have individualized mental health needs requiring different treatments and

interventions" and that the alleged injuries of the class members are not the same and therefore not subject to a uniform resolution." *Id*. at *7.

The district court found that commonality was satisfied, as the plaintiffs had "shown that there [were] numerous policies and practices in place on extended lockdown at DWCC that [were] the alleged source of the putative class's injuries." *Id*. The district court held that "[c]ontrary to Defendants' assertion, differences in the individual mental health needs are immaterial to this case because Plaintiffs seek to challenge the overall systems and policies in place. They do not contend that the treatment provided to an individual prisoner has exposed him to a substantial risk of harm, but rather, that all inmates are exposed to a substantial risk of harm due to the policies and practices in place on extended lockdown at DWCC." *Id*.

*Tellis* is distinguishable from the case at bar. As the above quoted language makes clear, although the *Tellis* plaintiffs suffered different injuries, the crux of their claims was the same— challenging the mental health policies in place (and seeking injunctive relief to stop them). In contrast, the Plaintiffs here have not identified a uniform practice or policy that they seek to end. Rather, they seek money damages for the harm they suffered—harms which differ greatly and which would require individualized inquiries in order for liability to be imposed.

For instance, in their Reply Memorandum [201], the Plaintiffs contend that their "overarching" Eighth Amendment claim is that "all persons incarcerated at Unit 29 were placed at risk of harm from violence and the environmental conditions at Parchman and that Defendants either failed to take reasonable steps or affirmatively exacerbated those risks." [201] at p. 3. However, even that contention creates further questions, such as: Which Defendants failed to take reasonable steps? Which steps should they have taken? How did they affirmatively exacerbate risks? The Plaintiffs attempt to address the issue at a more general level, arguing that the

Defendants are liable for all damages that were incurred if they failed to act reasonably: "[f]or example, if Defendant Hall was aware that the buildings at Unit 29 were falling apart exposing the people incarcerated there to risks of harm such as falling debris, infections due to flooding, electrocution, bites from vermin, etc. and she failed to take reasonable steps to address those dangers, she is personally liable for all injuries that resulted from those issues." *Id*. at p. 4. But this is an oversimplification of the issues at play, as there are undoubtedly causation issues with such a simplified explanation—particularly when considering the potential for *thousands* of Plaintiffs. Whether Hall played a role in any injury and the amount that any such injury should be attributed to her are necessarily fact intensive questions that cannot be answered at a highly generalized level as the Plaintiffs suggest. The same inquiry would be applicable to each Defendant. *See*, *e.g.*, *Lamb v. Mendoza*, 478 F. App'x 854, 856 (5th Cir. 2012) (citing *Burleson v. Tex. Dept. of Criminal Justice*, 393 F.3d 577, 590 (5th Cir. 2004)) ("Without proof of causation, a plaintiff cannot meet his constitutional burden. . . Causation of an injury was one of the elements [the plaintiff] had to prove to establish a constitutional violation."); *see also M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 843 (5th Cir. 2012) (noting that the deliberate indifference standard mandates "an individualized inquiry regarding the harm or risk of harm experienced by each class member").

Suffice it to say, this case is quite distinct from *Tellis*, which (again) sought only injunctive relief as to a particular policy, not monetary damages.

With these cases in mind, the Court concludes that commonality is not satisfied. The Court has articulated its concerns above and specifically notes again that the injuries the Plaintiffs seek to address—from being subjected to contaminated food and water, to being subjected to violence, to being injured by the physical structures of the facility spanning a period of almost five years—are vast. And notably, the Plaintiffs' request is not for injunctive relief—they seek monetary

damages. To do so, they must establish that each individual Defendant is not entitled to qualified immunity, an analysis that is inherently fact intensive and highly individualized. *See*, *e.g.*, *Edwards*, 31 F.4th at 932; *see also Rombach v. Culpepper*, 2021 WL 2944809, at *5 n. 7 ("An officer-by-officer analysis is necessary when determining whether any officer acted with deliberate indifference[.]").

The Court notes that the Plaintiffs have not cited in their filings any cases where class certification was granted in a prison case involving qualified immunity. Although there may be such a case and this Court does not definitively conclude that no such class could be certified, the Plaintiffs' lack of any authority on that point is noteworthy. This is particularly so considering that they seek money damages for approximately 4,000 persons, who were housed at Parchman for significantly different lengths of time and at different times, against 21 total Defendants, who were employed at Parchman at different times and in different roles.[4] The Plaintiffs have likewise not identified as *specific* policy or practice that they seek to challenge, as their allegations regarding the way in which the Defendants acted improperly differ greatly. *See*, *e.g.*, *Dockery v. Fischer*, 253 F. Supp. 3d 832, 846 (N.D. Miss. 2016) ("In a class context, plaintiffs must identify a unified common policy, practice, or course of conduct that is the source of their alleged injury. This policy need not be formal or officially-adopted but may instead by identified on the basis of custom or consistent practice. Failure to act can also constitute a policy or practice. A plaintiff must also connect the policy or practice to the alleged harm.") (citations and quotation marks omitted).

---

[4] There are numerous cases across the Fifth Circuit and the country involving prisoners challenging conditions of confinement and seeking injunctive relief to rectify those conditions. *See*, *e.g.*, *Ward*, 753 F. App'x 236; *Tellis*, 2021 WL 4267513; *Valentine v. Collier*, 2020 WL 3491999 (S.D. Tex. June 27, 2020). In fact, there was a parallel lawsuit filed in this Court near the same time as this lawsuit, seeking injunctive relief as to the conditions at Parchman. *See Amos, et al. v. Hall, et al.*, N.D. Miss. Cause No. 4:20-CV-7-SA-JMV. However, this case is different than each of those cases, as it seeks monetary damages from individual Defendants who have raised a qualified immunity defense.

Stated simply, the only way to resolve adequately and fairly each of these claims and potentially impose monetary damages against individual Defendants is to hold approximately 4,000 separate trials. Although a class action would undoubtedly be more efficient for the Plaintiffs, efficiency is not the standard, and the Fifth Circuit has instructed district courts to carefully consider the facts of the case and the elements of the Plaintiffs' claims before certifying a class. *See*, *e.g.*, *Ward*, 753 F. App'x at 246 (noting that it is "incumbent on the district court to consider and discuss the facts of this case, as well as the elements of Plaintiffs' claims, prior to rejecting Defendant's argument that dissimilarities among individual claimants obviate commonality.").[5]

The District Court for the Southern District of Mississippi has phrased the inquiry this way: "In short, the common questions identified must be dispositive of the claims. If they are not—if, for instance, after the common questions are answered one way or another individualized inquiries to determine liability would be needed—then commonality has not been established. *Dockery v. Fischer*, 253 F. Supp. 3d 832, 849 (S.D. Miss. 2015) (citing *Ahmad v. Old Republic Nat. Title Ins. Co.*, 690 F.3d 698, 704 (5th Cir. 2012)). That is precisely the scenario before the Court. Even if many of the questions that the Plaintiffs identified were answered, others would abound. As emphasized above, individualized inquiries would be necessary before the imposition of liability. The Plaintiffs cannot survive a rigorous analysis of the commonality requirement. Class certification is not appropriate.

Having reached that conclusion, the Court need not analyze the remaining Rule 23 prerequisites. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34, 133 S. Ct. 1426, 185 L. Ed. 2d

---

[5] Notably though, permitting individual Plaintiffs to proceed on their own would provide those individuals with an opportunity to fully present the precise facts of their particular case and seek recovery on the specific harms which they allegedly suffered against the relevant Defendant(s).

515 (2013) ("[C]ertification is proper only if the trial court is satisfied after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.").

### C.  *Alternative Argument*

The Plaintiffs also make an alternative argument as to certification, which they articulate as follows:

> In the alternative, Plaintiffs move this Court to bifurcate this matter and certify a "Liability Class" defined as "all persons incarcerated at Parchman Unit 29 for more than two weeks at any point during the class period and all persons incarcerated at Parchman Unit 32 for any period of time during the class period from February 7, 2017, through December 31, 2021." This class would exist at Phase I of the bifurcated trial and establish whether the conditions at Parchman violated the class members['] Eighth Amendment rights, with Phase II consisting of individual trials for class members where they would prove damages and a separate opt-in class for all persons who did not sustain physical injuries and merely seek nominal and punitive damages against the Defendants.

[189] at p. 5-6.

Other than referring to this alternative argument at the outset of its original Memorandum [189], the Plaintiffs provide no specific arguments as to how it would work practically. However, the Court finds that the same commonality issues it identified above would persist.  As set forth above, "Rule 23(a)(2) demands that the putative class members' claims 'must depend upon a common contention' that 'must be of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Yates*, 868 F.3d at 361 (quoting *Dukes*, 564 U.S. at 350, 131 S. Ct. 2541). To that end, "what matters for Rule 23(a) is not the raising of common questions—even in droves—but, rather the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* (quoting *Dukes*, 564 U.S. at 350, 131 S. Ct. 2541) (internal punctuation and additional citations omitted).

If a "Liability Class" were certified, the Plaintiffs would still face the same challenges with the inability to generate common answers apt to drive the resolution of the litigation. The Plaintiffs' proposal concedes as much when it suggests that the Court would conduct "individual trials for class members[.]" [189] at p. 6.

In their Memorandum [189], the Plaintiffs cite *Watson v. Shell Oil Co.*, 979 F.2d 1014 (5th Cir. 1992), for the proposition that it "affirm[ed] the creation of a bifurcated class action addressing the issues of liability and individual damages." *Id*. at p. 7. The Court has reviewed *Watson*, which arose from an explosion at one of Shell's facilities. *Watson*, 979 F.2d at 1016. The district court in that case developed a four-phase plan for trial, wherein a jury first decided questions of liability and then "determine[d] compensatory damages in 20 fully-tried sample plaintiff cases. Based on the findings in these cases, the jury would then establish the ratio of punitive damages to compensatory damages for each class member." *Id*. at 1017-18. In the next phase, a different jury would resolve compensatory damages in "trials in waves of fives, scheduled according to a format based upon factors, including location of the injured person or property at the time of the explosion and extent and nature of the damages. The district court anticipates that 'after several waves are tried, a reasonable judgment value for each category of claims would emerge so as to facilitate settlements." *Id*. at 1018.

The Court need not expend considerable efforts outlining the differences in *Watson* and the case at bar. Importantly though, the Court notes that there was only one main event leading to the damages (the explosion) and only two defendants (against whom liability could be determined at one time). This is, of course, a far cry from the case before the Court.

The Plaintiffs have not developed this argument in their briefing, and the Court does not find it necessary to articulate additional arguments for them. The Court rejects the Plaintiffs' alternative argument.

II.    *Daubert Motions [164, 166]*

The Defendants also filed two *Daubert* Motions [164, 166], wherein they seek to strike opinions of the Plaintiffs' experts (Shefftz and Vare). In those filings, the Defendants specifically noted that the experts' opinions were not helpful to the class certification issue. *See*, *e.g.*, [165] (arguing that "Shefftz's opinions are irrelevant and unhelpful to the class certification analysis[.]"). Having declined to certify the class, the Court finds it appropriate to deny these Motions [164, 166] *without prejudice*. Should this litigation proceed and the Defendants have other arguments related to these experts, they may refile *Daubert* motions. The pending Motions [164, 166] are DENIED *without prejudice*.

*Conclusion*

For the reasons set forth above, the Plaintiffs' Motion to Certify Class [188] is DENIED. The Defendants' *Daubert* Motions [164, 166] are DENIED *without prejudice*. The Magistrate Judge will hold a status conference in due course.

SO ORDERED, this the 23rd day of September, 2024.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE